John Hysong et al., Appellants, *v.* Gallitzin Borough School District et al.

164 629
182 253

164 629
39SC 461
39SC 463
39SC 466

*School laws—Teachers—Sisters of charity—Sectarian instruction—Use of religious dress—Discretion of directors.*

School directors may employ as teachers, sisters of a religious order of the Roman Catholic Church, and permit them while teaching to wear the garb of their order, provided no religious sectarian instruction shall be given, or religious sectarian exercises engaged in.

When a teacher of good moral character applies for a school, and presents a certificate of qualification as to scholarship and aptness to teach, that is an end of judicial inquiry into the action of the board in appointment, because the law makes no further inquisition upon this point.

*Constitution—Religious belief—Exclusion from public office.*

The exclusion of a sister of charity from employment as a teacher in the public schools, because she is a Roman Catholic, is a violation of the spirit of article 1 of the Bill of Rights, relating to religious liberty.

The fact that such teachers contribute all their earnings beyond their support to the treasury of their order to be used for religious purposes, has no bearing on the question of their right to employment as teachers.

Argued Oct. 9, 1894. Appeal, No. 295, Oct. T., 1894, by plaintiffs, from decree of C. P. Cambria Co., June T., 1894, No. 1, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill to restrain employment of sisters of charity in public schools. Before BARKER, P. J.

The case was heard on bill, answer, and proofs taken by the court without an examiner or master.

The opinion of the court below was as follows:

" The bill in this case, which was filed on April 28, 1894, avers :

" That the plaintiffs are citizens, residents and taxpayers of the school district of Gallitzin borough, and some of them parents of children attending or entitled to attend the public schools therein.

" That those of defendants named as sisters are engaged in teaching the said schools, having been employed by the directors, who are also made defendants, and that the directors have paid them and intend to continue to pay them monthly wages out of the public school funds of Gallitzin borough.

" That said teachers received their certificates from the county superintendent and made the contracts as teachers in their religious names alone, and so kept their school records and made their reports.

" That the said sisters are members of the religious order of the Sisters of St. Joseph, of the Roman Catholic Church, and while teaching in said public schools wear the garb, insignia, and emblems of their order, and that they use their said garbs, insignia, and emblems in such a manner as to impart to the children under their instruction certain religious and sectarian lessons and ideas peculiar to said Roman or Holy Catholic Church.

"That said sisters have taken vows whereby they have renounced the world and their worldly names and interests, and largely such connections, associations and pursuits as ordinary individuals have, and that they are disqualified by the rules, requirements, seclusions, and training of their order from fully performing all the duties of teachers in the public schools.

"That they are thereby prevented and disqualified from associating or conversing with males over the age of fourteen and from teaching hygiene and physiology efficiently, and that to accommodate the schools to these disqualifications the scholars are not properly classified and graded, there being no males in room No. 8, taught by a sister, and no females in No 7, taught by a male teacher.

"That the said board of directors and said teachers have adopted rules and announced them to the children in said public schools whereby they are required to address the said teachers as 'sister' and call them by their religious names, with penalties for the enforcement of the said rules, and by similar rules the resident and other priests of the Roman or Holy Catholic Church are encouraged to and do visit the said public schools very frequently, and take the books and hear the recitation of lessons by classes and go around in the schoolrooms and inspect the studies and work of the scholars individually, and the scholars are taught and required to rise and address the said priests as 'father' and thank them for their visits and request them to come again.

"That the catechism of the Roman or Holy Catholic Church and other religious instruction are studied and taught in said public schools before, during and after school hours, and that the catechisms aforesaid are furnished to the pupils of said public schools and placed in said public schools by the authorities or representatives of the said Roman or Holy Catholic Church; that the said religious teaching is carried on under the supervision and by the said religious teachers, and is permitted and allowed by the said school directors, and that the said teachers unlawfully used the public school building and the musical instruments therein for the purpose of teaching private pupils instrumental music for a money consideration for the use of the order of the Sisters of St. Joseph before, during, and after school hours.

" That the said school directors have 'resolved that they would employ no teachers for six of the rooms in said public schools of said district except sisters of the sisterhood of St. Joseph.'

" That the said defendants propose and have arranged, after the present public school term closes, to replace the same by parochial schools in said public school building, taught entirely by said sectarian sisters, defendants above named.

" The plaintiffs further aver that, in pursuance of the control and management of the schools in the manner set forth, certain children of some of the plaintiffs and of other residents, citizens and taxpayers, are ' deprived of the use, benefit, and education in said public schools for the reason that the said defendants will not permit the said children to attend the said schools unless they go to a school department taught by one of the said sisters,' and 'by reason of the said sisters being employed and being in their religious garb, emblems, and insignia, and the use of said catechism and other religious instruction in said schools, against the protest and objection of said plaintiffs and parents ;' and ' that the result of the management of the said schools by said directors and sectarian teachers is a transformation of the public schools into sectarian schools and the maintenance and support of private sectarian schools out of the public school fund of said district, in derogation of the rights of the children, parents, citizens, and taxpayers of said district, in violation of law, and more especially in violation of the rights of conscience of plaintiffs and their children,' and that these actions and violations of the laws and the constitution ' cause and produce continuous and continuing, and will continue to cause and produce, irreparable and irremediable injury and damage to them,' and they, therefore, pray that a preliminary injunction, afterward to be made perpetual, be granted restraining the said school district and said district directors, and each of them and their successors, from employing and continuing to engage and allow said teachers in said public schools, and from permitting them to remain in said public schools as teachers or otherwise while wearing said garb, emblems, or insignia, and restraining them from permitting the use of the catechisms or any other sectarian books as books of instruction in said public schools ; and from the use of public

school property in any way for sectarian purposes, and from continuing to employ said teachers under certificates issued in their religious or sectarian names; and that in like manner the said teachers be restrained from acting in the capacity of teachers or otherwise in said public schools while wearing said garb, emblems, or insignia, and from using or furnishing for use said catechisms or other methods of sectarian instruction in said schools, and from causing or permitting the pupils to address them or others by any sectarian title or name whatsoever, and from using or permitting the use of the public school property for any other than free, common, public school purposes, and that defendants and each of them be restrained from, in any way or manner, directly or indirectly, appropriating or using money raised for the support of the public schools of said district in the support of any sectarian school or any sectarian school purpose, or for any purpose other than the support of the free, common, public schools of said district.

" The allegations contained in the bill and in the injunction affidavits accompanying it abundantly warranting the issuing of a preliminary injunction, it was accordingly awarded, and May 3d fixed for a hearing. On that day the defendants filed their answers, in which they admit the employment of members of the order of the Sisters of St. Joseph as teachers in the public schools of Gallitzin and their payment from the public school fund, but deny that they had 'resolved to employ no teachers for said six rooms in said public schools except sisters;' and they further deny that the said sisters have 'renounced the world and have given up their worldly names and worldly interests, and largely such connections, associations, and pursuits as ordinary individuals usually have in secular communities and society,' averring that the renunciation of the world is to be understood in a religious sense alone, and not as an absolute separation from the world and worldly associations, connections, and interests, and that 'they are known by their family names, and do engage in secular pursuits and employments in which other women engage who are not members of the said order or of similar societies;' they deny that the catechism of the Roman Catholic Church or any other religious instruction is taught in said public schools before or during school hours, but they admit 'that after the public schools are

dismissed for the day, catechism is taught to such children as voluntarily remain to receive the same, but deny that the catechisms are furnished and placed in said public schools by the authorities or representatives of the Roman Catholic Church or by any person whomsoever during public school hours;' they aver that the study of the catechism and religious instruction of any kind during school hours is strictly forbidden, and that the musical instruments used in the said building are not the property of the school district; they deny the averment in plaintiffs' bill that children are deprived of the use, benefit, and education of the public schools for the reasons alleged in the bill and recited above; they deny that the said teachers are, by the rules and requirements of the said sisterhood, disqualified from associating or conversing with a male over the age of fourteen years, or from teaching hygiene and physiology efficiently, and that the rooms are graded to accommodate these qualifications; they deny that the result of the management of the schools is to transform them into sectarian schools, and aver that it is not intended to use the public school buildings for sectarian purposes or for any other unlawful use, or that they have done or permitted any acts or things which have in any wise caused any damage or irreparable injury to the plaintiffs, or that they intend to do so; and, further, that at the time of the service of the writ in this case the school term was practically ended, but three, or at most four, days remaining yet to be taught.

" [These are the material averments, admissions, and denials in the bill and answer.  Both contain, however, many matters by way of allegation, admission and denial as to the duties of school directors and the legal effects of the acts complained of and the conclusions to be drawn from the same, the plaintiffs alleging these acts to be in violation of the duties of the defendants and in disregard of the law, and the defendants denying that such conclusions can be drawn from the acts complained of; but the allegations in the bill and answer, in this behalf, need form no part of the present recital of the issue made up for us to try; it is for us to determine from the law what the rights and duties of the respective parties are, and to draw conclusions from the law and the evidence.] [1]

" After some considerable testimony had been introduced, it

was agreed by the counsel of the respective parties that the testimony should be considered as taken upon a final hearing, and that the parties would proceed to a final hearing at the sitting then in progress.

" Thirty-seven witnesses were examined on each side, and elaborate arguments were made by counsel, some five days being consumed in the testimony and the arguments, and, having given the matter our careful consideration, we now proceed to announce our conclusions:

" For some years members of the religious order known as the Sisters of St. Joseph, and spoken of in these proceedings as sisters, have taught in the public schools at Gallitzin. Until the erection of the building now in use, and which was used for the first time for the term just closed, four sisters had been employed by the school board as teachers and taught public schools in a building belonging to them or to the Catholic congregation at Gallitzin, which was rented by the school board for that purpose, and in the public school building in another part of the town there were two schools taught by teachers other than sisters. On the completion of the new building, which contained eight rooms, in the fall of 1893, the six sisters made defendants here were employed as teachers, and Mr. Gray and Miss McGlade were also employed, Miss McGlade teaching in room No. 1, the lowest grade, and Mr. Gray in room No. 7, having all boys as pupils, and Sister Mary John in room No. 8, having all girls as pupils. The pupils in No. 6 were also all girls, the other rooms having pupils of both sexes.

" [It does not appear that there was any principal in the sense that any one teacher had any supervision or control over any room other than his or her own. The grading was done by Mr. Gray and Sister Mary John under the direction of the school board; and while there was some evidence of improper grading in the testimony of Mr. Gray, there was none that the sexes were separated to accommodate any disqualification of the sister to teach males. The term commenced about the first of November, 1893, and continued until the 30th of April, 1894, when it was interrupted by the service of process in this case. The contract with the teachers, when the term commenced, was for seven months, but by resolution of the board of directors, concurred in by the teachers, it had been

agreed, a few days before the service of this injunction, that the term should end at the expiration of six months. The term, therefore, had really ended, under the agreement between the parties, before the commencement of the taking of testimony.] [7]

" [The day that the schools opened for the present term, Mrs. Hysong and Mrs. Williamson, parents of protestant children who theretofore attended the schools not taught by sisters, made objection to the directors and to the teachers against having their children taught by the sisters. Their children were temporarily placed in Miss McGlade's room, and in a day or so were informed by her, and their parents were informed by a director, that a proper grading would place them in rooms taught by sisters, and that unless they went to these rooms they would have to leave the school. They did leave the school, and did not return during the term.] [15]

. " [The sisters employed as teachers had regular certificates granted to them in their religious names by the county superintendent, after a private or special examination given them at the Mother House in Ebensburg.] [4] [They contracted with the directors in their religious names, and used them in the transaction of any business connected with their occupation as teachers. They wore at all times the familiar and distinctive garb of their order, with crucifix suspended from the neck and black beads or rosary attached to a cincture, or girdle, which they wore around their waists; but there was no sufficient evidence that they used the garb or insignia mentioned in such a manner as to attract particular attention to them or their signification, or endeavored to so use them as to impart sectarian or religious instruction.] [8]

"There were two pianos in the public school belonging to the sisterhood, one in Sister Mary John's room and one in the directors' room, the former being used to accompany the school in vocal musical exercises, and on the other Sister Mary John gave lessons to private pupils after school hours, and they sometimes practiced on it during school hours.

. "In the rooms where sisters were employed as teachers, the Catholic catechism was taught by them each day, excepting Friday, immediately after the close of the regular school exercises, to children of Catholic parents, or, to state the matter

more precisely, all Catholic children were expected by the teachers and their parents to remain after 4 o'clock and recite lessons previously assigned them, and which they were expected to have prepared the same as any other lessons, from catechisms containing religious instructions applicable to the Roman Catholic Church, and containing explanations and instructions as to observances, ceremonies, and beliefs peculiar to the Roman Catholic Church. These books were furnished by the sisters to the pupils, or purchased by the parents from the church authorities. They were taken to the schoolhouse by the children with their other books and kept in their desks with them. It was a common occurrence for the children to take the catechisms from their desks or school-bags and study their lessons in them during school hours, sometimes one hearing another recite the lesson. This was forbidden by the sisters, and frequent instances were given in evidence of reproof administered by them whenever this prohibition was violated. So far as the evidence shows that the sisters had any knowledge of this use of the catechism during school hours, they invariably forbade such use and reproved the children detected in it. This catechism instruction after school hours was with the knowledge of the directors and was permitted and allowed by them. There was but one instance in evidence of any instruction in the catechism excepting after school, and that was where a recitation was given two or three children before school hours, during which protestant children were not permitted to enter the room, and the sister giving this lesson stated in evidence that it was done as a punishment to these children.

" [There was no evidence of any religious instruction or religious exercises of any character whatever during school hours.] [11]

" [None of the sisters engaged as teachers attended the teachers' institute, held at Ebensburg in the fall of 1893. Their schools were closed during the sittings of institute, and most of them visited during that week at the Mother House at Ebensburg. The schools taught by the sisters were closed on December 8th and on the day preceding Good Friday, these being days of obligation or holidays in the Roman Catholic Church; but the sisters did not receive pay for the days when their schools were closed.] [7]

" [It was the custom of the scholars attending schools taught by sisters to address them as 'Sister,' although there was no rule of the board or written or announced requirement by the directors or teachers that this should be done. The pupils, with very few exceptions, conformed to this custom and addressed them as 'Sister.' The same custom existed as to addressing Catholic priests as 'Father,' when they visited the schools; and the resident Catholic priests, as well as others who had formerly been located at Gallitzin, quite frequently visited the schools. We find no evidence that they conducted themselves in any manner different from any other person visiting the schools, either in the hearing of recitations or otherwise, nor that there was any difference observed in the treatment of them by the scholars from that accorded to any other visitor, the same custom being observed as to rising and saluting any other grown person who visited the schools; as, for instance, where a physician visited the schools, the scholars would rise and say, 'Good-morning, Doctor;' and as to any grown person not having a title, he would be addressed by his proper name when it was known.] [9]

" The population of Gallitzin is about three thousand, consisting of about two hundred and fifty Catholic families and about fifty protestant families. The average attendance at the public schools during the term just closed was about four hundred. All the scholars in rooms 7 and 8 were Catholics excepting one or two. In the room taught by Sister De Sales —No. 2—there were about fifty Catholics and thirty protestants. In the room taught by Sister Gonzaga—No. 6—the average attendance was about thirty, two thirds of whom were Catholics. In the room taught by Sister Sebastian—No. 5— there were about thirty-five pupils, about one half of them being Catholics. In the room taught by Sister Marcella— No. 4—the average attendance was about fifty, three fourths of whom were Catholics. The proportion in the other rooms does not appear in the evidence.

" [The principal vows taken by the sisters are obedience and poverty. They own no property individually, and their earnings as teachers are paid to the sister in charge of the house where they are at the time residing. They are required to wear the garb of the order, and are not allowed to take it off

'during the day, either on account of their work or the heat of the day.'] [5] [It was not proven, either by the constitution of the order, offered in evidence, or by any other evidence, that the sisters are prohibited from associating or conversing with males over the age of fourteen years, or that there is anything in their vows, or elsewhere, to prevent them from teaching physiology and hygiene efficiently.] [7]

" [The sisters who had been employed to teach public schools in the parochial school buildings usually taught terms of free school after the close of the public schools, to which all were admitted, regardless of religion or residence, and in which they had prayers according to the forms of their church and imparted catechism instruction during school hours; and there was some evidence of an intention to teach a similar school after the close of the public term, which was interrupted by the injunction.] [7]

" [While it was not proven that the school directors had 'resolved' that they would employ no teachers for six of the rooms in the public school building, except sisters, in the sense that a resolution had been formally adopted and recorded to that effect, yet it was. as clearly established as though spread on the minutes in unambiguous terms, that the intention existed to employ none but sisters in certain of the rooms. The evidence of this intention is found in the history of the schools during the period concerning which evidence was admitted, and in the correspondence of the board with the county superintendent. It was further established that such sisters were employed as were detailed by the Mother Superior of the order at Ebensburg to reside at the Gallitzin House.] [4]

" We have, with considerable regard to details, stated our finding of facts, passing without comment, however, some matters alleged in the bill and not proven, and others in the proof not material, and will next proceed to a statement and discussion of the law, to be followed by our conclusions and decree.

" [The first and second sections of article 10, in the constitution of Pennsylvania, read as follows:

" 'SECTION 1. .The general assembly shall provide for the maintenance and support of a thorough and efficient system of public schools wherein all the children of this commonwealth, above the age of six years, may be educated, and shall appropriate at least one million dollars each year for that purpose.

" ' SEC. 2. No money raised for the support of the public schools of the commonwealth shall be appropriated to, or used for, the support of any sectarian school.'

" The relief sought for by the plaintiffs is claimed on the ground that the conduct of the defendants has been in violation of the second section above quoted; they contend that they have proven that sectarian influence was exerted and sectarian teaching engaged in, in the public schools of Gallitzin, and that sectarian control was exercised in their management, and thereby these schools were transformed from public schools into sectarian schools, in the meaning of the constitution, and its spirit as well as its letter disregarded and their constitutional rights infringed upon.

" There are two other sections of our constitution to be considered in connection with the ones quoted above, in order to determine whether the constitutional rights of the plaintiffs have been invaded. Section 3, of article 1, of the constitution, which is the Declaration of Rights, reads as follows: ' All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.

" Section 18 of article 3, relating to legislation, reads as follows: ' No appropriations, except for pensions or gratuities for military services, shall be made for charitable, educational, or benevolent purposes to any person or community, nor to any denominational or sectarian institution, corporation, or association.'] [2]

" Taking the sections of the constitution quoted by us and reading them together, and it is evident there is no such ambiguity or uncertainty as to require us to go beyond the language used to ascertain the proper construction; but whether we depend upon the language itself or apply the recognized tests for the proper construction of constitutions, we must conclude that these sections were all born of the fixed purpose and intent that church and state must be kept separate in this com-

monwealth. The plain, obvious meaning of the 2d section of article 10, and of the 18th section of article 3, is that money raised by compulsory taxation for the support of public schools or other public purposes shall not be used for the propagation or encouragement of the doctrines of any religion, or church—as the term is more commonly used—since that would be a diversion of the money from the purpose for which it was raised, and a violation of article 1, section 3, of the constitution just quoted. Judge COOLEY, in his work on Constitutional Limitations, at page 469, enumerates among the things which are not lawful under any of the American constitutions, 'Compulsory support by taxation or otherwise of religious instruction;' and he says, 'Not only is no denomination to be favored at the expense of the rest, but all support of religious instruction must be entirely voluntary. It is not within the sphere of government to coerce it.'

" Similar provisions exist in the constitutions of nearly every state in the Union; and we might quote from the opinions of many eminent judges to demonstrate the wisdom and purpose of such provisions, which have invariably been approved when judicially considered. We will content ourself, however, with one such quotation, and that from the opinion of our distinguished predecessor—Judge DEAN—delivered in the case of Wesley Spires against the Treasurer and School Directors of Gallitzin District, No. 73, Sept. Term, 1882: 'The state intrudes not on the tender domain of conscience, takes no part in religious controversy, does not authorize her officers, either judges or school directors, to do so. She says to all her citizens: " Teach the sectarian doctrines approved by your consciences in your homes, in your churches, and in your denominational schools; but the state will form no union with any of you by teaching them in her public schools." The reasons for this stand taken by the state have been so often announced, and are so obvious and convincing that it would be a waste of words to repeat them here. It is sufficient to say that, after years of discussion, this has now become her settled policy, as declared in the constitution of 1874, adopted by more than one hundred and forty thousand majority.'

" It seems to us to be appropriate and proper at this point to suggest that it must not be understood that christianity is to be

excluded from the public schools. 'Christianity is a part of the common law of Pennsylvania—not christianity founded on any particular tenets, but christianity with liberty of conscience.' Updegraff v. Commonwealth, 11 S. & R. 394. It has been so held in a majority of the states of the Union that christianity, being a part of the common law of England, became the common law of the states ; therefore, it is not intended that the broad principles of morality that enter into christianity and form part of the system should be excluded from the instructions given in the public schools ; but it is intended and everywhere insisted on that the public schools shall not be made the medium for disseminating the beliefs or tenets of any particular religion, and that all denominational religious instruction must be excluded therefrom. ' It is religion, and sectarian religion, that is excluded ; morality and good conduct may be inculcated in the common schools, and should be.' Justice ORTON, in State v. Dist. Board, 76 Wis. 177.

"It must be remembered that the framers of our constitution had in view, when they prohibited, in article 3, section 18, the appropriation of public money to 'sectarian institutions,' and in article 10, section 2, to 'sectarian schools,' institutions, and schools under the control or management of some particular sect and organized for the purposes of such sect, and in the latter section such schools as these in distinction from the public schools ; and, further, that these sections were intended to be in restraint of the appropriation of money to such institutions and schools ; indeed, the chairman of the committee on education, in the constitutional convention, in introducing article 10, said : ' We have provided further (referring to section 2), and this by way of restriction upon the legislature.' Therefore, such decisions as there are in cases arising under these and similar provisions of the constitutions of other states, relate to the right to appropriate or collect money for the support of schools and institutions organized and controlled by some sect and conducted in its interest, as distinguished from public or common schools, and consequently have no direct bearing on this case and are of no value except to aid us in ascertaining the rules of construction by which we are to be governed. [We are confronted with a much broader proposition than that considered in any of the adjudicated cases ; and that is, what acts of teachers

and directors will transform a 'public school of the common-wealth' into a 'sectarian school' in the sense that the spirit of the constitution is violated and the court warranted in interfering? And, incidentally, what constitutes a misuse of the school property? We have adopted the above form of inquiry because it is in precise conformity with the line of testimony and argument relied upon by counsel on both sides at the hearing of this case, and is consistent with the admissions in the pleadings that the public schools should be conducted on a non-sectarian basis.] [3]

"The presumption is that a word used in a constitution is used with the meaning ordinarily attached thereto. It has always been held in Pennsylvania that, unless it clearly appears that words are used in a technical sense in the constitution, they are to have their plain, natural, and obvious meaning. Chief Justice LEONARD, of Nevada, in the case of Nevada v. Hallock, 16 Nevada, 385, in referring to the word "sectarian" in the Nevada constitution, which prohibits the use of public funds for 'sectarian purposes,' says the word is used in the popular sense; and he concludes that the Nevada Orphan Asylum of Virginia City, where all children were required to be present when Catholic prayers were said, and where the only religious instruction or exercises pertained to the Catholic Church, and which was owned, controlled, and managed by a religious organization, was a sectarian institution, and that the appropriation of money to it would be for a 'sectarian purpose,' within the prohibition of the constitution. We quote from his opinion : 'It is what is taught, and not who are instructed, that must determine this question. If the instruction is of a sectarian character, the school is sectarian. . . . It was intended that public funds should not be used directly or indirectly for the building up of any sect, and any instruction or exercises which in common schools would be of sectarian character are so at St. Mary's School.'

"In the case of the County of Cook v. the Industrial School for Girls, 125 Illinois, 540, the Chicago Industrial School, so called, did not own or lease any buildings, but placed all girls committed to it under the sole charge and control of the House of the Good Shepherd and St. Joseph's Orphan Asylum, which were organizations owned and controlled by the orders con

nected with the Catholic Church. The constitution of Illinois prohibits payment in aid of any church or sectarian purpose, or to help, support, or sustain any school controlled by any church or sectarian denomination whatever, or to any church or to any sectarian purpose, and notwithstanding the act incorporating the Industrial School authorizes them to receive state aid, the school was held to be sectarian, and that public money could not be appropriated to it because that would be appropriating it to a sectarian purpose.

" In the case of the People v. The Board of Education of Brooklyn, 13 Barbour, 410, it was held that an act authorizing the ·Orphan Asylum Societies to participate in the distribution of school moneys was in violation of the constitution, which provides that the revenues of the common school fund shall be applied to the support of common schools, because the pupils admitted to these asylums were confined to orphans and they were under the control of trustees, and, therefore, were not common schools in the ordinary and popular meaning of that term.

" In the more recent case of the Synod of Dakota v. The State of South Dakota, 14 L. R. A. 418, the Pierre University was incorporated to maintain and promulgate the doctrine and belief of the sect known as Presbyterians, and a class of students was instructed in the method of teaching under a contract with the state and in pursuance of an act of assembly authorizing it, but it was held that no pay could be collected. for such instruction, because the constitution prohibited the appropriation of money for the benefit of any sectarian or religious society or institution, as well as the appropriation of money to aid any sectarian school; and this notwithstanding the fact that the class mentioned above were excused from any exercises where sectarian doctrines were taught.

" These are the leading authorities wherein the term 'sectarian school' has been under discussion, and we only quote from them to illustrate the suggestion hereinbefore made as to the distinction drawn between 'sectarian schools' and 'public schools.' There are other cases in which the meaning of the word 'sectarian,' as used in different constitutions, has been passed upon, but the definitions of the word, as applied to the purposes of inquiries arising under the varying terms of

different constitutions, are not general or applicable to all cases. Judge DEAN, all through the opinion heretofore cited from, recognizes the distinction referred to by us, and concludes his inquiry as to what constitutes a sectarian school as follows: 'Therefore, any school established and controlled by a sect, which teaches or propagates the peculiar or special doctrines of that sect, is a sectarian school.'

"In the light of such decisions and aids as we have, keeping in view the intent of the framers of the constitution and the understanding of the people when they ratified it, we conclude that whenever religious sectarian exercises are engaged in, or religious sectarian instruction imparted in a public school, that school becomes a sectarian school in the sense of our inquiry.

" [Had the plaintiffs sustained by proof the allegations in their bill ' that the catechism of the Roman or Holy Catholic Church and other religious instruction are studied and taught in the said public schools before, during, and after school hours,' that would bring the said schools within our definition, because instruction in the catechism referred to during school hours would undoubtedly be religious sectarian instruction that would not be tolerated by the courts if complained of ; but we have already stated in our finding of facts that there was no evidence of religious sectarian instruction of this or any other character given or imparted during school hours, or of religious sectarian exercises engaged in ; and our inquiry would end here as to this feature of the case were it not for the contention of the plaintiffs that the employment of members of the order of Sisters of St. Joseph as teachers in the public schools, and the wearing by them of the garb of their order during school hours, in itself constitutes a sectarian influence and of itself imparts sectarian instruction.

" There is doubtless room for argument as to the wisdom and propriety of school directors employing members of this or any other order to teach in the public schools in the garb of their order, but we are not now to determine whether the directors acted wisely or not, but to determine under the law, as we have construed it, whether sectarian religious instruction has been actually given or is liable to be given in the public schools. The questions involved in this case cannot be decided accord-

ing to the personal predilections of the counsel engaged therein, or of the litigants involved, or of the court itself. They must be decided according to the law as we find it written in the constitution; we cannot make or unmake the law, we can simply construe it.

"The only law we have in this state on the subject is found in the constitution, .there being no legislation on the subject-matter involved, and we find nothing therein either plainly expressed or that by implication or inference would warrant us in so construing it as to announce as an abstract proposition that the mere teaching in a public school by a member of the order of Sisters of St. Joseph, in the garb of her order, would constitute that school a sectarian school in the sense that the court would be warranted in interfering; and yet that is what we are asked to say, there being no proof of actual sectarian instruction or sectarian exercises or influence in the public school.] [8]

"The constitutions of many of the states in the Union, and more particularly the ones last to be admitted, contain prohibitions against the introduction of sectarianism into public schools much more stringent than that in our own, and expressed in much more explicit language, and in some of the states they have legislation on the subject. We have referred to a case arising under the Nevada constitution. In that state it is provided in the original constitution that any school district which should allow instruction of a sectarian character therein, might be deprived of its portion of the interest of the. public school fund during the time of such instruction. It is also provided that no sectarian instruction shall be imparted or tolerated in any school or university that may be established under the constitution ; and, subsequently, these provisions not being considered stringent enough, there was embodied in the constitution a prohibition against the use of the funds of the state or of any county or municipality for sectarian purposes. [We might give numerous extracts showing the more stringent provisions in the constitutions, as well as the laws of other states, which have been before the courts for construction, but nowhere have we any intimation in the decisions of any court that the teaching in the public schools by a member of the order of the Sisters of St. Joseph or any similar order, in the habit of their .order,

made the school a sectarian school, or that it violated the rights of conscience of any one. On the contrary, the only judicial utterance we have on the subject is that of Judge DEAN, in the opinion already quoted from, wherein he says: 'For example, the fact that Sisters Angela and Stanislaus were members of St. Joseph's Convent, and wore the habit of their order while engaged in teaching, in itself proves nothing. The board had a right to employ Catholic teachers if they thought proper, and the teachers had a right to appear in the schoolroom in such dress as suited their inclinations.'

"We have no intimation from the public school department of this state that any such construction would be placed on the question if submitted for determination. We have examined an opinion given by ex-state superintendent Higbee in 1888, and now on file in the department, in which this precise question did not come up, but which arose under the section of the constitution now under consideration, wherein he follows closely the predominant idea in the decision cited by us, and it seems to us his language excludes the affirmative of the proposition we are now discussing. We quote from his opinion: 'A school is not sectarian because taught by a minister or priest or any church official; but a school controlled or managed in the interests of any particular church organization, upholding its peculiar confession and ecclesiastical practice, and used for any class of pupils exclusive of others, is certainly sectarian.'

"And, although not in evidence in this case, it has become public property in connection therewith, as part of the literature pertaining to such matters, that similar views are entertained by the present superintendent of public instruction. We do not mention these matters as affecting our decision, nor as in the least binding upon us, but as indicating the absence of such conclusion as the plaintiffs contend for in the minds of those who are in control of the affairs of the public schools in the state. We have studied with care and interest the decision of a distinguished ex-judge, who, at the time of its delivery, was superintendent of public instruction in New York state, and on which considerable reliance was placed by counsel for plaintiffs; and we concur in much that was said therein by him, but it by no means follows from the language used by him that had he then been on the bench and asked to apply the strong

arm of the equity side of the court he would have found the matters that he says 'ought not to be persisted in' sufficient grounds to warrant him in doing so.] [10]

" [The policy of the directors of the Gallitzin public schools of discriminating in the employment of teachers, in favor of persons belonging to a particular class, members of an exclusive religious order, connected by vows and organization with the church to which all the members of the board belong, indicates to our mind a reprehensible indifference on the part of the directors to the policy of the law to absolutely divorce all matters tending to sectarianism from the public schools. But it is also the policy of the school law of this state, which lodges in the directors the power to employ teachers, not to interfere with them in the exercise of that power unless it be arbitrarily exercised to the detriment of the schools or interference with the rights of the taxpayers, and while it is apparent to us that these directors were influenced and controlled in the selection of teachers by their religious associations and connections, yet, it being conceded that the teachers who were employed were efficient and competent instructors, and it not being proven that they intruded their religious belief in the form of religious instruction or religious observances during school hours, there is neither authority in the law nor in the decisions for us to say that the selection of them by the directors was the exercise of such an arbitrary discretion as would warrant the court in interfering at this date. They had regular certificates issued by the county superintendent, granted after an examination] ; [4] [they contracted with the school directors to teach these schools ; had already taught within a few days of six months when this proceeding was commenced, and would have completed the term in three or four days had it not been interrupted by it.] [7] Some of them had been employed in these public schools for years uncomplained of, so far as the evidence shows ; and while this custom would not make it lawful, if otherwise unlawful, yet we could not disregard it if the case hinged on the question as to whether the directors had exercised an arbitrary discretion.

" [We conclude, as to this branch of the case, that, in the absence of proof that religious sectarian instruction was imparted by them during school hours, or religious sectarian exercises engaged in, we cannot restrain, by injunction, members

of the order of Sisters of St. Joseph from teaching in the public schools in the garb of their order, nor the school directors from employing or permitting them to act in that capacity.] [5] [15]

" The use of the public school building in imparting religious instruction after school hours, in the manner detailed by us in our conclusions of fact, is not only a violation of the fundamental law of the state in that the instruction, being purely and essentially sectarian in its character, is prohibited, but the directors exceeded their authority in permitting any such use to be made of the building.   It is very clear to us that the prohibition of the appropriation of money raised for the support of public schools to sectarian schools includes the use of the public school buildings, erected by such money, for any sectarian purpose.   But there is a further reason for restraining the use of the public school building for this purpose, as well as for any other purpose foreign to public school instruction ; and that is that, the building having been erected for a particular corporate purpose, the corporate authorities cannot authorize its use for any other, and any diversion is illegal, and must be restrained when complained of.   This seems to be the tendency of all the decisions where this question has been raised.   Our school law (act of May 8, 1854) gives the school districts the capacity of bodies corporate, and authorizes the purchase of such real and personal property as may be necessary for- the establishment and support of the schools.   The schoolhouses and school property are held by the directors as corporate bodies, in trust for the uses for which they were erected under the law and the constitution, and none other ; and under the familiar and well-known principle that corporations have only such powers as are within the scope of their charters, they cannot permit this property to be used for any other purpose.   The use for which these buildings were held and are held is for public or common schools ; and while it might be argued that the misuse complained of in this case may be regarded as incidental to the primary purpose of the building, and that the purpose is innocent and promotive of the improvement and benefit of the pupils participating in it, nevertheless it is a diversion of the building from its primary purpose, beyond the power of the directors to permit.   There are a number of decisions bearing on this question, but the principle is so clear to us that we will not burden this opinion with quotations from them.

" The use of the public school building by these sisters for a free term after the conclusion of the public school term, to be conducted in the manner they had previously conducted similar terms in the building belonging to them, would be a plain violation of the law as just laid down by us that would not be tolerated, for that would be a misuse of the school property beyond the authority of the school board to authorize, and not permissible.

" While it is true that the evidence of the intent to conduct a private term of school in the manner indicated at the conclusion of the public term is slight, yet it is sufficient to warrant the apprehension that such would be done unless restrained. Everything that we have said as to the use of the public school buildings for any other than common school' purposes would apply to their use for giving music lessons to private pupils therein, which is a misuse of the building, and should be restrained when complained of.

" The fact that the sisters employed as teachers did not attend the sessions of the teachers' institute indicates to our mind a lack of professional zeal and interest in their employment, and the fact that they closed their schools on church holidays indicates that possibly their zeal as members of the church was greater than their professional zeal, but these are matters concerning which they must answer to their employers—the directors—and concerning which the latter must answer to their constituents.    The court cannot take action on such matters as these without usurping the functions of the school directors, and more especially since it was in evidence by the testimony of the sisters that there is nothing in their vows or elsewhere to prevent them from attending the teachers' institutes or teaching on church holidays, if required to do so by the directors.

" [ [There were other matters in evidence, not affecting the main question involved, to which the preceding suggestions apply.   For instance, the custom of the children of addressing the teachers as 'Sister,' is the same as exists in society everywhere, and to which all the counsel conformed on the trial of this case.   We agree with counsel for plaintiffs that this custom of designating the teachers by a name identifying them with a religious order is not essential to school discipline and possibly subversive of it, and yet it is too plain for argument

that it is not within the province of the court to restrain teachers in the public schools from permitting pupils to address them by such titles, there being no rule of the school requiring pupils to do so.] [9]

" [We observe that in the prayer for relief we are asked to restrain the directors from ' employing said teachers under said certificates issued as aforesaid in their religious or sectarian names,' and we assume this was intended to be the subject-matter of a separate ruling, but it would be inconsistent with our ruling on the main question involved to make the injunction perpetual in this respect; or, in other words, to say it is lawful to employ members of the order of Sisters of St. Joseph as teachers, but not by the names in which the certificates issued to them by the county superintendent were made out.

" We have no jurisdiction in this case to express an opinion as to the granting of certificates as aforesaid, but we think that when members of this religious order contract for employment in secular matters, that it ought to be in their secular names, instead of their ' religious or sectarian names ; ' but these views do not give us jurisdiction in this case to restrain the defendant directors from employing them under the certificates issued by the county superintendent in their religious names. However, we do not regard this as of much moment, as it would seem from a ruling of the Department of Public Instruction, offered in evidence, that this matter will be regulated by the county superintendents in the future.] [4]] [6]

" The prayers for relief in this case are so general in character as to make it difficult to formulate a decree covering the specific grounds passed upon and binding on the parties. We shall endeavor, however, in this respect to follow the prayer for relief as closely as possible, and, as we have in our findings of law and facts, to so place our conclusions on record as to facilitate a review by the Supreme Court of every feature of the case, in order that precedents may be established for future guidance in matters which, if unsettled, may seriously impair the thoroughness and efficiency of our common school system.

" In pursuance of the matters contained in this opinion, it is directed that the following decree be entered :

" [ [And now, August 20, 1894, this case having been previously heard and fully considered, it is ordered and decreed as

follows: That the preliminary injunction heretofore granted be dissolved in so far as the same restrains the school district of Gallitzin borough, the school directors of said district, and their successors from employing the other defendants named in the bill as teachers in said public schools under the certificates issued by the county superintendent in their religious names,] [12] [and permitting said teachers to remain as such while wearing the garb of the order of Sisters of St. Joseph, and in so far as it restrains the said teachers from acting in the capacity of teachers while wearing the garb of said order,] [13] [and it is also dissolved in so far as it restrains the said teachers from permitting the pupils to address them by the title of 'Sister,' or a visiting priest as 'Father.'] [14]] [16]

"And the said preliminary injunction is made perpetual, in so far as it restrains the defendants from permitting the use of the catechisms of the Roman Catholic Church as books of instruction in said public school buildings at any time, whether during school hours or otherwise, and from using the said catechisms for said purpose therein, and from giving or permitting any religious sectarian instruction therein at any time, and from using or permitting the use of the public school property for any other than free, common school purposes.

"And it is further ordered and decreed that the defendants pay all docket costs taxed in this case and the costs of their witnesses and service of subpœnaes thereon, and [that the plaintiffs' pay the costs of their witnesses and the service of subpœnaes thereon.] " [17]

*Errors assigned* were (1–17) portions of opinion and decree in brackets as above, quoting them respectively.

*T. H. Baird Patterson* and *H. W. Storey, A. D. Wilkin*, with them, for appellants.—The wearing of an unusual garb, worn exclusively by members of one religious sect, and for the purpose of indicating membership in that sect, by the teachers in the public school, constitutes a sectarian influence which ought not to be allowed, particularly in view of the impressible minds of the children and the insinuating influence of the "sisters" and "fathers" of the Catholic Church.

The constitution means that the common schools shall be ab-

solutely non-sectarian, not in degree, as may be construed, but shall be free and clear of any semblance of sectarianism : Const., art. 1, § 3, art. 3, § 18, art. 10, §§ 1, 2 ; Spires v. Directors of Gallitzin District, No. 73, Sept. T., 1882, Cambria Co., by DEAN, J., unreported ; State v. District Board, 76 Wis. 177 ; Nevada v. Hallock, 16 Nev. 385 ; Cook Co. v. Industrial School, 125 Ill. 540 ; People v. Board, 13 Barbour, 410 ; Synod v. State, 14 L. R. A. 418 ; s. c., 2 S. Dakota, 366 ; Colt v. Board, by Judge DRAPER, Sup. N. Y. Schools, Report for 1888.

We think the schools were entirely under the control and management of, and in the interest of the Roman Catholic Church and by such management were sectarian schools.

It matters not how efficient the teachers may be to instruct the pupils in the recognized text-books, if their selection, actions, conduct, or connection with a religious association be to such an extent that their religious belief, doctrine, customs, or usages impart or teach it, that moment it is sectarianism.

The action of the directors was in clear violation of the constitution : People v. Board of Education of Brooklyn, 13 Barbour, 410 ; Wharton v. School Directors, 42 Pa. 363 ; Township v. Linn, 36 Pa. 431.

*David L. Krebbs, F. J. O' Connor, M. D. Kittel* and *P. J. Little* with him, for appellees.—The findings of fact of a judge sitting as a master must stand except in a clear case of error. The effect is the same practically as the verdict of a jury upon questions of fact: Kisor's Ap., 62 Pa. 428 ; Phillip's Ap., 68 Pa. 130 ; Sproull's Ap., 71 Pa. 137.

The employment of members of the order of the sisterhood of St. Joseph as teachers in the public schools and the wearing by them of the garb of their order during school hours does not in itself constitute sectarian influence, nor impart sectarian instruction : Const., art. 1, §§ 1, 3, 4.

The office of teacher affects the general interests of society and is within the meaning of the constitution and decision of Com. v. Sutherland, 3 S. & R. 148.

Christianity is a part of the common law of Pennsylvania, not christianity founded on any particular tenet, but christianity with liberty of conscience : Updegraff v. Com., 11 S. & R. 394.

The silent influence of a life of morality, or the dress of an individual, is not such control or interference with the rights of conscience as is enjoined by § 3, art. 1, of the constitution. It is the active influence which is prohibited.

OPINION BY MR. JUSTICE DEAN, Nov. 12, 1894:

This bill was filed to restrain the school directors of Gallitzin borough from permitting sectarian teaching in the common schools of the borough, and from employing as teachers, sisters, or members of the order of St. Joseph, a religious society of the Roman Catholic Church. What seem to us the most material averments of the bill were denied in the answer. The employment, however, of the members of this society, was admitted. The court, after full hearing, found as a fact: "There was no evidence of any religious instruction or religious exercises of any character whatever, during school hours." But the court further found that after school hours the schoolroom was used by the teachers in imparting Catholic religious instruction to children of Catholic parents, with the consent of or by request of the parents. This the court enjoined, because it was a use of the school property for sectarian purposes after school hours.

As to the fact admitted, that of the eight teachers, six of them were sisters of a religious order of the Catholic church, and while teaching wore the habit of their order, the learned judge of the court below says: " We conclude, as to this branch of the case, that, in the absence of proof that religious sectarian instruction was imparted by them during school hours, or religious sectarian exercises engaged in, we cannot restrain by injunction members of the order of Sisters of St. Joseph from teaching in the public schools in the garb of their order, nor the school directors from employing or permitting them to act in that capacity."

This legal conclusion is reached, after a very able and impartial opinion, in which the facts are reviewed, and the law bearing on the question very fully cited. The opinion is so convincing, that it seems to us it must compel the assent of the unprejudiced mind, whether layman or lawyer. In thus expressing our full accord with the learned president judge of the court below, we intimate no opinion as to the wisdom or

unwisdom of the action of the school board in selecting six Catholic school teachers, members of an exclusively relig'.ous order.   In this matter was involved, solely, the exercise of discretion by the school board in the performance of an official duty, for which they alone are responsible ; this discretion, when it does not transgress the law, is not reviewable by this or any other court.   When a teacher of good moral character . applies for a school, and presents a certificate of qualification as to scholarship and aptness to teach, that is an end of judicial inquiry into the action of the board in appointment, because the law makes no further inquisition up to this point. The burden of appellant's complaint here is set out in the 8th assignment of error, as follows :

" The court erred in finding that the employment of the Sisters of St. Joseph as teachers in the public schools, and their acting as such while wearing the distinctive sectarian garb, crucifixes and rosaries of their order and sect, could not be enjoined."

Unquestionably these women are Catholics, strict adherents of that faith, believing fully in its distinctive creed and doctrine.   But this does not disqualify them.   Our constitution negatives any assertion of incapacity or ineligibility to office because of religious belief.   Article 1 of the Bill of Rights declares : " All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience ; . . . . no human authority can in any case whatever control or interfere with the rights of conscience.".

If by law any man or woman can be excluded from public office or employment because he or she is a Catholic, that is a palpable violation of the spirit of the constitution ; for there can be, in a democracy, no higher penalty imposed upon one holding to a particular religious belief, than. perpetual exclusion from public station because of it.   Men may disqualify themselves by crime, but the state no longer disqualifies because of religious belief.   We cannot now, even if we wanted to, in view of our law, both fundamental and statutory, go back a century or two to a darker age, and establish a religious test as a qualification for office.   In this case, the school board committed no unlawful act in selecting these Catholic women as teachers, because, by moral character and certified attain-

ments, they were qualified, and their religion did not disqualify. The board may have thought that because of their previous training and discipline they were specially qualified as teachers, just as protestant school boards sometimes think the graduates of particular schools or colleges make the best teachers; but there is no proof that they were appointed because they were Catholics, in preference to others, as well, or better, qualified, but not members of that church. It appears, that the members of the school board are Catholics. The voters of the borough number between four and five hundred, and all but about fifty of these are Catholics. Under such circumstances, it is probable that often the board will be wholly Catholic, just as we see all over the commonwealth in school districts largely protestant, the whole board composed of non-Catholics. We suppose, in many cases, the Catholic school director is of the opinion that the schools and colleges controlled by his church train the best teachers; the protestant director is of an opposite opinion, and prefers, as teachers, those educated in protestant denominational schools or colleges. Inevitably, in a popular government by the majority, public institutions will be tinged, more or less, by the religious proclivities of the majority; but in all cases where a discretion is reposed by law, we must assume, in the absence of evidence to the contrary, that the public officer has performed his duty. We cannot infer, from the mere fact that a school board composed of Catholics has selected a majority of Catholic teachers, therefore it has unlawfully discriminated in favor of Catholics; because, the selection of Catholic teachers is not a violation of law or, which is the same thing, is not an abuse of discretion. Unless this be the case, no court has power to revise the exercise of this discretion, for the very sufficient reason, the law has not made the court school directors, while it has devolved on six citizens of Gallitzin borough the duties of that office.

Nor does the fact that these teachers contributed all their earnings beyond their support to the treasury of their order, to be used for religious purposes, have any bearing on the question. It is none of our business, nor that of these appellants, to inquire into this matter. American men and women, of sound mind and twenty-one years of age, can make such disposition of their surplus earnings as suits their own notions. We might

as well, so far as any law warranted it, inquire of a lawyer, before admitting him to the bar, what he intended to do with his surplus fees, and make his answer a test of admission. What he did with his money, could in no way affect his right to be sworn as an officer of this court, therefore it would be impertinence in us to inquire.

But it is further argued that, if the appointment of these Catholic teachers was lawful, they ought to be enjoined from appearing in the schoolroom in the habit of their order. It may be conceded that the dress and crucifix impart at once knowledge to the pupils of the religious belief and society membership of the wearer. But is this, in any reasonable sense of the word, sectarian teaching, which the law prohibits? The religious belief of many teachers, all over the commonwealth, is indicated by their apparel. Quakers or Friends, Ommish, Dunkards and other sects, wear garments which at once disclose their membership in a religious sect. Ministers or preachers of many protestant denominations wear a distinctively clerical garb. No one has yet thought of excluding them as teachers from the schoolroom on the ground that the peculiarity of their dress would teach to pupils the distinctive doctrines of the sect to which they belonged. The dress is but the announcement of a fact, that the wearer holds a particular religious belief. The religious belief of teachers and all others is generally well known to the neighborhood and to pupils, even if not made noticeable in the dress, for that belief is not secret, but is publicly professed. Are the courts to decide that the cut of a man's coat, or the color of a woman's gown, is sectarian teaching, because they indicate sectarian religious belief? If so, then they can be called upon to go further. The religion of the teacher being known, a pure unselfish life, exhibiting itself in tenderness to the young, and helpfulness for the suffering, necessarily tends to promote the religion of the man or woman who lives it. Insensibly, in both young and old, there is a disposition to reverence such an one, and, at least to some extent, consider the life as the fruit of the particular religion. Therefore, irreproachable conduct, to that degree, is sectarian teaching. But shall the education of the children of the commonwealth be intrusted only to those men and women who are destitute of any religious belief?

Our recollection extends back almost to the beginning of the common school system of the commonwealth; in many counties there never was a time when ministers of protestant sects were not frequently selected as teachers; some of them wore, in the schoolroom where children of Catholic parents were pupils, a distinctively clerical garb; when the office of county superintendent was first created in 1854, in many counties preachers were chosen to fill the office; the present State Superintendent of Public Instruction is a protestant preacher. It is fair to presume that high moral character, the result of christian sectarian teaching, as well as scholarly attainments, prompted their selection. Ordination vows binding them to a particular creed, were considered no disqualification; it was not assumed that the fact of membership in a particular church, or consecration to a religious life, or the wearing of a clerical coat or necktie, would turn the schools into sectarian institutions. In the sixty years of existence of our present school system, this is the first time this court has been asked to decide, as matter of law, that it is sectarian teaching for a devout woman to appear in a schoolroom in a dress peculiar to a religious organization of a christian church. We decline to do so; the law does not so say. The legislature may, by statute, enact that all teachers shall wear in the schoolroom a particular style of dress, and that none other shall be worn, and thereby secure the same uniformity of outward appearance as we now see in city police, railroad trainmen, and nurses of some of our large hospitals. But we doubt if even this would repress knowledge of the fact of a particular religious belief; that, if the teacher had any, would still be effectively taught by unselfish devotion to duty; no mere significance or insignificance of garb could conceal it; the daily life would either exalt or make obnoxious the sectarian belief of the teacher.

After a most careful consideration, we see nothing of merit in any of the assignments of error which have been so earnestly pressed in the argument. The decree is affirmed and appeal dismissed, at costs of appellants.

Mr. Justice Williams dissenting :

I can go with my brethren on all the questions involved in this case save one. I cordially assent to the proposition that

teachers should be selected for the common schools because of their fitness and not because of their religious belief or their church affiliation.   I am glad that in this state and in this country the rights of conscience are no less sacred than the rights of property, and that test oaths and religious disqualifications belong to a period further back than the memory of the present generation can reach.   I hope they may never be restored.   But the constitution and laws of this commonwealth provide for open free schools, for all children of the proper age, that shall be secular in character.   Schools in which the consciences and the sectarian bias of both parents and children shall be respected, or at least not interfered with.   Their purpose is to provide an elementary education that shall help to fit the rising generation for actual business, and the duties and privileges of citizenship.   Is the public school in the borough of Gallitzin so conducted ?   It is a school with eight departments and a separate teacher for each.   The eight teachers are members of the same church or sect.   This is unusual but not unlawful.   Six of these teachers presiding over six of the departments are nuns of the sisterhood of St. Joseph.   They have renounced the world, their own domestic relations, and their family names. They have also renounced their property, their right to their own earnings, and the direction of their own lives, and bound themselves by solemn vows to the work of the church and to obedience to their ecclesiastical superiors.   They have ceased to be civilians or secular persons.   They have become ecclesiastical persons known by religious names, and devoted to religious work.   Among other methods by which their separation from the world is emphasized, and their renunciation of self and subjection to the church is proclaimed, is the adoption of a distinctively religious dress.   This is strikingly unlike the dress of their sex whether Catholic or protestant.   Its use at all times and in all places is obligatory.   They are forbidden to modify it.   Wherever they go this garb proclaims their church, their order, and their separation from the secular world as plainly as a herald could do if they were constantly attended by such a person.   The question presented on this state of facts is whether a school that is filled with religious or ecclesiastical persons as teachers, who come to the discharge of their daily duties wearing their ecclesiastical robes and hung about with the rosaries

and other devices peculiar to their church and order is not necessarily dominated by sectarian influences and obnoxious to the spirit of the constitutional provisions and the school laws?

This is not a question about taste or fashion in dress, nor about the color or cut of a teacher's clothing. If it was only this I would favor the largest liberty. It is deeper and broader than this. It is a question over the true intent and spirit of our common school system as disclosed in the provisions referred to. If this is a proper administration of the school laws in Gallitzin it would be equally so in any other school district of the state; and if every common school was presided over by ecclesiastics in their distinctive ecclesiastical robes, supplying pupils with copies of their church catechism on application and teaching it before and after school hours to all who chose to remain for that purpose, it seems to me very plain that the common schools would cease to be such and would become, to all practical intents and purposes, parochial schools of the church whose ecclesiastics presided over them.

Clergymen sometimes wear on the street a coat or hat that affords some evidence of their profession, but they do not appear in churchly robes when about their daily work, or in any garb that points out the church to which they belong or the creed to which they adhere. But these six teachers in Gallitzin do just that. They wear, and must wear, at all times a prescribed unchangeable ecclesiastical dress which was plainly intended to proclaim their non-secular and religious character; their particular church and order, and their separation from the world. They come into the schools not as common school teachers, or as civilians, but as the representatives of a particular order in a particular church whose lives have been dedicated to religious work under the direction of that church. Now the point of the objection is not that their religion disqualifies them. It does not. Nor is it thought that church membership disqualifies them. It does not. It is not that holding an ecclesiastical office or position disqualifies, for it does not. It is the introduction into the schools as teachers of persons who are by their striking and distinctive ecclesiastical robes necessarily and constantly asserting their membership in a particular church, and in a religious order within that church, and the subjection of their lives to the direction and control of its

officers. No priest or bishop in full canonical dress more plainly declares his church, and his office therein, than do these non-secular and ecclesiastic persons when they come into the schoolroom of a secular public school wearing the peculiar uniform and insignia of their sisterhood. The common schools are supported by general taxation. The Catholic and the protestant, the Jew and the infidel, help support them, and have an equal right to their benefits. The common schools cannot be used to exalt any given church or sect, or to belittle or override it; but they should be, like our political institutions, free from ecclesiastical control and from sectarian tendencies. Is the public school of Gallitzin such an one? The protestant children of that borough do not think so. Their parents do not think so, as appears most plainly by this litigation. The directors evidently did not think so for they repulsed the mothers who came to them to beg that their children might be put in a department not presided over by one of these ecclesiastical persons. The learned judge of the court below did not think so for he enjoined against the teaching of the catechism and all other sectarian instruction, but he left the ecclesiastics in full charge. With faces averted from the world they have renounced; wearing their peculiar robes which tell of their church, their order and their subordination to the guidance of their ecclesiastical superiors; using their religious names and addressed by the designation, "sister,". they direct the studies and the deportment of the children under their care, as ecclesiastical persons. They cannot or they will not attend teachers' institutes. They have no touch with those engaged in the same pursuit about them. They do not attend public examinations; but, examined in the seclusion of the "Mother House" of their order, after having been selected by the "Sister Superior" in compliance with the written request of the directors, they come to their work as a religious duty, and their wages pass, under the operation of their vows, into the treasury of the order. If a school so conducted is not dominated by sectarian influence, and under sectarian control, it is not easy to see how it could be. If in some neighboring borough the several departments of the public school should be filled by Episcopal clergymen as teachers, who should appear only in their canonical robes, and with their prayer books sus-

pended from their necks, and if Catholic parents of children entitled to admission into the school should appeal to the courts for relief for their children from the presence and influence of ecclesiastics who insisted upon keeping the name of their church and their relation to it before the minds of their pupils, I should no more doubt their right to such relief than I can doubt the right of the plaintiffs in this case.