## Use of State College Facilities For Religious Activities

PACKEL, Attorney General, January 15, 1973.—
You have asked our office for a determination con-
cerning whether it is permissible to allow students,
faculty or staff to hold organized religious activities
on State college campuses. You are advised that such
activity is lawful subject to the limitations contained
herein.

## INTRODUCTION

At the present time, the State colleges of the Com-
monwealth follow a rather uniform policy of not per-
mitting organized religious activities of any kind by
anybody on State college campuses. The resulting
inconvenience and even hardship to students attend-
ing those institutions who wish to worship are obvious
and have been raised again and again by students,
professors, and administrators. Most recently, in-
quiries have been received from or concerns expressed
by Clarion, Lock Haven, Bloomsburg, and East Strouds-
burg. At Bloomsburg, for example, there are 2,000
Roman Catholic students, many of whom do not wish
to worship downtown, because among other things,
they wish the services to reflect their needs and their
views rather than those of the older adult community
in town.

But there are more substantial difficulties. Of the
14 State colleges in the Commonwealth, many are in
the deepest rural area of the State, where only a small
number of denominational institutions are represented
and where long distances must be traveled to reach
certain churches and/or clerics. Public transportation

is, for the most part, nonexistent and private transportation unavailable for many. While many students and faculty live and work on campus and find that the campus community provides for many of their needs, they find they must look elsewhere at sometimes great cost and inconvenience to satisfy their spiritual needs. In addition, some students may even be faced with the prospect of violating their religion, if they wish to attend religious services long distances away from the college campus. Consider, for example, the situation of the Orthodox Jew who may not travel on the Sabbath or Holy Days except on foot and not past the town limits. He must either pray alone in his room or violate a stricture of his faith.

While other examples may be provided, it is obvious that the present policy of the State colleges imposes substantial hardship on many students and faculty, and may even be unconstitutional as violative of the First Amendment of the United States Constitution. As Justice Brennan noted in the case of School District v. Schempp, 374 U.S. 203, 296 (1963):

"There are certain practices, conceivably violative of the Establishment Clause, the striking down of which might seriously interfere with certain religious liberties also protected by the First Amendment. Provisions for churches and chaplains at military establishments for those in the armed services may afford one such example. The like provision by state and federal governments for chaplains in penal institutions may afford another example. It is argued that such provisions may be assumed to contravene the Establishment Clause, yet be sustained on constitutional grounds as necessary to secure to the members of the Armed Forces and prisoners those rights of worship guaranteed under the Free Exercise Clause."

We conclude below that we need not reach the issue raised by Justice Brennan of whether the present policy at our State colleges violates the "Free Exercise Clause," because there is no statutory or constitutional requirement forbidding religious activities by students, faculty, or staff at reasonable times and subject to the guidelines set forth below.

*Is it a violation of the Constitution or laws of the United States or of Pennsylvania to allow organized religious activity by students, faculty, or staff on our state college campuses?*

The Pennsylvania Constitution and the United States Constitution have clauses relating to the establishment and free exercise of religion. The First Amendment to the United States Constitution, made applicable to the States by the Fourteenth: Murdock v. Pennsylvania, 319 U.S. 105 (1943), commands that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." Chief Justice Burger noted in his majority opinion in Walz v. Tax Commission, 397 U.S. 664 (1970), that since both the establishment and free exercise clause are cast in absolute terms, "[T]he Court has struggled to find a neutral course between the two Religion Clauses . . . either of which, if expanded to a logical extreme, would tend to clash with the other." Id., at 668.

"The course of constitutional neutrality . . . ," the Chief Justice continued, "cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited." The Chief Justice then stated the general principle deducible from the First Amendment, incorporating much of what has been said by the court in previous cases:

" [T]hat we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts *there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.*" Id., at 669. (Italics supplied.)

Chief Justice Burger went on to say:

"Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so. Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses has prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice." Id., at 669.

It is clear from the language of the Walz decision that by refusing to adopt a literal interpretation of the religion clauses of the First Amendment, which would have precluded any interrelationship between church and State, the court acknowledged that the two clauses are interdependent and therefore require some nexus. Only on a case-by-case basis can the line between permissible and impermissible governmental action be distinguished. Accordingly, any general principles which the court has formulated in this area were developed in a whole series of cases. Any attempted extraction of isolated language within a single opinion can lead to confusion and misunderstanding of the findings of the Supreme Court in subsequent cases. Mr. Chief Justice Burger recognized the danger of possible contradictions when he stated in Walz that:

"The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect,

may have been too sweeping utterances on aspects of these [religion] clauses that seemed clear in relation to the particular cases but have limited meaning as general principles": 397 U.S. 664, 668.

The hazard of placing too much weight on a few words or phrases of the court was emphasized by Chief Justice Burger. He cited Everson v. Board of Education, 330 U.S. 1 (1947), where Justice Black writing for the majority said that the First Amendment "means at least this: Neither a state nor the Federal Government can . . . pass laws which aid one religion, aid all religions, or prefer one religion over another." The actual result in Everson was the upholding of a form of assistance to church-sponsored parochial schools (reimbursement of bus fares). This was also true in a later decision in which the court upheld the loaning of textbooks to children in parochial schools through the use of public funds: Board of Education v. Allen, 392 U.S. 236 (1968). See also Nebraska State Board of Education v. School District of Hartington, — U.S. —, 93 S. Ct. 220 (1972).

It can thus be seen that the United States Supreme Court has left a grey area between the extremes of the two religion clauses of the First Amendment in which some forms of "aid" will be upheld and others will not. Since the Court determined that the two clauses may overlap, it has fashioned a test for distinguishing between forbidden involvements of the State with religion and those contacts which the Establishment Clause permits. "The test may be stated as follows: What are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legisla-

tive purpose and a primary effect that neither advances nor inhibits religion": School District v. Schempp, 374 U.S. 203, 222 (1963); Everson v. Board of Education, 330 U.S. 1 (1947).

Keeping this test in mind, it is clear that the use of State college facilities by students, faculty, or staff for religious activities at the State colleges is not in violation of the Establishment Clause when reasonable accommodations are provided at reasonable times which do not interfere with the regular activities of the college; when all groups requesting the use of the facilities are given equal access thereto; when the users are members of the college community; and when payment is made for exceptional expense incurred by the college in providing these facilities. To make college facilities available for religious activities is not establishment of religion but rather the "benevolent neutrality" spoken of in the Walz decision, because by merely providing a facility for any and all wishing to worship in any way they wish, the State is neither establishing nor inhibiting religion. We must stress, of course, that anything more than the mere provision of physical facilities for worship on a disinterested and equitable basis might very well tip the delicate balance of interests toward an unconstitutional Establishment of Religion.

It has been argued that the Pennsylvania Supreme Court cases of Bender v. Streabich, 182 Pa. 251 (1897) and Hysong v. School District of Gallitzin Borough, 164 Pa. 629 (1894), require a different conclusion, but it is clear that this is not so. Both of these cases held that school directors had no authority to permit public school buildings to be used for sectarian religious instruction or for other than school purposes. These decisions were based upon a construction of what is now the Act of March 10, 1949, P. L. 30, art. VII, as amended. 24 PS §7-775.

"§7-775. Use of school buildings for other purposes; arrangements with city, borough, or township

"The board of school directors of any district may permit the use of its school grounds and buildings for social, recreation, and other proper purposes, under such rules and regulations as the board may adopt. The board shall make such arrangements with any city, borough, or township authorities for the improvement, care, protection, and maintenance of school buildings and grounds for school, park, play, or other recreation purposes, as it may see proper. Any board of school directors may make such arrangements as it may see proper with any officials or individuals for the temporary use of school property for schools, playgrounds, social, recreation, or other proper educational purposes, primaries and elections, and may permit the use of any school building for holding official meetings of the governing authorities of corporate or politic, governmental or quasi-governmental bodies, created by authority of any act of Assembly. The use thereof shall not interfere with school programs and shall be subject to reasonable rules and regulations adopted by the board of school directors."

That statute clearly deals only with school buildings that belong to a school district and not with the buildings at State colleges.

One of the legislative reasons in making such a distinction might very well have been that, as the cases have indicated, the State must be especially careful when providing religious activities for impressionable young children, whereas the same considerations do not apply to young adults, who are more able to defend and protect their own religious views.

But there is another more fundamental reason for the distinction. Students at a State college are in an atmosphere where the State is, to a degree, organizing

314

the intellectual and social life of the community. For four years, students spend a large part of their working *and leisure hours* on the State college campus. To put it another way, the State college campus *is* the community, whereas the public school is only a small *part* of the larger community of the public school pupil and his parents. It is proper for the State, in the former situation, to provide for voluntary student religious activity to avoid imposing a serious burden on religious exercise and to provide a full opportunity for community life. See Katz, Freedom of Religion and State Neutrality, 20 U. Chi. L. Rev. 426 (1952).

## CONCLUSION

For the reasons set forth above, and subject to the limitations expressed above, it is our opinion, and you are so advised, that reasonable accommodation for student, faculty and staff religious worship, at reasonable hours, on a strictly neutral basis, may be provided at the State colleges and universities.