CITY OF NEW HAVEN *v.* TOWN OF TORRINGTON.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

Argued May 2—decided June 14, 1945.

*Harry Ossen,* for the appellant (defendant).

*A. Frederick Mignone,* with whom, on the brief, was *Vincent P. Dooley,* for the appellee (plaintiff).

DICKENSON, J. The plaintiff town sought to recover from the defendant town an expense incurred in the education of children which the plaintiff claimed was properly chargeable to the defendant under the provisions of General Statutes, Cum. Sup. 1935, § 334c. The defendant has appealed from a judgment for the plaintiff, claiming no liability on grounds that the school in which the children were educated was not a public school; that there was no evidence that the children had legal settlement in the defendant town, and that the claim, in any event, was barred by the Statute of Limitations. A further claim of the defendant is that the particular provision of § 334c, subsection (e),

upon which the court based its judgment, was not embraced in the allegations of the complaint.

The finding, on which no substantial attack is made, is as follows: Prior to 1880 there was, and ever since has been, in the city of New Haven a Roman Catholic charitable institution known as St. Francis Orphan Asylum dedicated to the care of orphans and neglected children. In 1879, the board of education of the city of New Haven, pursuant to its duly passed vote, entered into an arrangement with the orphanage whereby it obtained the use of rooms in one of its institutional buildings for the purpose of establishing and maintaining a grammar school. The school was called the St. Francis Orphan Asylum School until 1934, when its name was changed by the board to "Highland Heights School." It has been maintained in the same building since 1879, which building is owned by the orphanage, a diocesan corporation having as its president the Roman Catholic bishop of the Hartford diocese. The building is not used exclusively for school purposes. There are eight rooms devoted to such purposes. Other rooms are used as a nuns' waiting room, offices for two resident priests, a chapel for the celebration of religious exercises, and living quarters for nuns and priests. In another part of the building are dormitories where the inmates or pupils of the school live. Prayers are offered by them upon arising and before and after each meal; a retreat, lasting a week, is held for them once a year; and they attend mass on Sunday and on religious holydays. None of these religious exercises is held during the time allotted for school sessions. All of the inmates of the orphanage are of the Roman Catholic faith and all of them are required to attend the school except those who are too young or those who have completed their grammar

school education and are attending local high schools, but the school has always been open to any child living in the neighborhood regardless of religious faith, and occasionally such children have been enrolled as pupils. The school day commences at 8:45 a.m. in conformity with the order of the board of education applying to all grammar schools in New Haven. An hour before, the pupils assemble in the classrooms and receive religious instruction from the nuns for one-half hour.

The teaching staff of the school consists of two lay women and eight nuns, and one of the latter is the principal. The nuns are attired in religious apparel while teaching and are employed as teachers because the practice conforms to the spirit of the orphanage. All of the teachers are appointed by the superintendent of schools of New Haven with the approval of the board of education and must be certified public school teachers. They are paid from the public treasury, their salaries being identical with those of similar classifications in the educational system of the city. They participate in the New Haven Teachers' Tenure and Retirement Acts. The board of education provides supplies for the school and the same textbooks which it uses in other grammar schools in the city, and the courses of study are those prescribed by the board for all schools. Special studies such a shopwork, manual training, physical education, art, cooking, sewing and music are conducted at times at the school by special supervisors who teach these subjects throughout the school system. Medical, nursing and dental care are provided in conformity with the practice in other grammar schools. The equipment in the classrooms conforms to the requirements of state law and the teachers keep standard registers required by the state board of

education. A uniform type of diploma given at graduation exercises of grammar schools in the city is used. The school complies in all respects to the requirements of state law. At no time during the school sessions is any form of religious exercise permitted or given. The plaintiff, in addition to the school at the orphanage, maintains, among many others, grammar schools at the New Haven Orphan Asylum, the New Haven General Hospital and the Peabody. Museum owned by Yale University.

At various times during the years 1933 through June, 1937, eighteen children were committed by the juvenile side of the City Court of Torrington to the Litchfield County temporary home and almost directly thereafter were "placed out" by the proper authorities in the St. Francis Orphan Asylum, where they attended the Highland Heights School. The trial court found the per capita expense of tuition in the school and gave judgment for the plaintiff based on that finding.

Chapter 54, of which § 334c is a part, lays down certain limited basic requirements for the conduct of the educational program and provides that no state aid shall be granted any town unless its schools have been kept according to law. Section 334c provides as follows: "Reimbursement for nonresident children. (a) Any town responsible for the support or education of a child attending school in a town other than the one in which he has a legal residence shall reimburse such other town for his tuition at the rate of the per capita expense of tuition in such school . . . (e) The school expense of any child placed out from a county home shall be paid by the town from which he was committed."

A preliminary contention of the defendant is that

the complaint was predicated on subdivision (a) of § 334c and the court based its judgment on subdivision (e) without support in the pleadings. The allegations of the complaint are broad enough to sustain a recovery under either subdivision of the statute, and as, without seeking a more specific statement, the defendant saw fit to file a general denial and go to trial it could not thereafter object; see cases, Conn. App. Proc., §§ 25, 26. Moreover, the point was not raised in the trial court and so presents nothing for our present consideration. Practice Book, § 363. The issue of liability under subdivision (e) was a principal one in the trial of the case and was one properly considered by the trial court.

The defendant assumes that "legal residence" as used in the statute is the equivalent of settlement. The domicil of a child is ordinarily that of his parents. *Yarborough* v. *Yarborough*, 290 U. S. 202, 211, 54 Sup. Ct. 181; 17 Am. Jur. 625. But in *Kelsey* v. *Green*, 69 Conn. 291, 37 Atl. 679, we held that, as regards the jurisdiction of a probate court to appoint a guardian for a minor, he resided where he had his actual stated dwelling place even if his domicil was in another state by reason of his father's residence there, and we said (p. 301): "In other sections of our statutes generally, the word 'reside' is used in a sense which includes all who are the actual, stated dwellers in any given place, even though they may have a technical domicil elsewhere." This, no doubt, is the sense in which the words "legal residence" are used in subsection (a) of the act. To hold otherwise would be to attribute to the legislature, by the passage of that act, an intent to make a drastic change in the whole theory of our school laws, or else to bring about a lack of harmony in their various provisions. The present school law

does not base the obligation of a town to educate its children upon settlement. Section 323c continues the ancient requirements that each year there shall be in each town an enumeration of the children who shall "belong to" it, and the principal grant of state money to the towns is upon the basis of that enumeration, § 325c.

In *Yale* v. *West Middle School District*, 59 Conn. 489, 491, 22 Atl. 295, we held that legal residence for school purposes does not necessarily mean domicil, but rather a residence in the ordinary and popular meaning of the word; that the state is interested in having all of its children educated and has framed its school laws accordingly; and that (p. 492): "If any child is actually dwelling in any school district, so that some person there has the care of it, and is within the school age . . . then that child must go to the public school." The child "belongs to" that town. It is in this sense that subdivision (e) of § 334c must be construed, that the town whose duty it is to provide schooling for the child is liable for the cost of his education to the town where, by reason of his commitment, he is required to go to school. The defendant town made no claim in the trial court that the children lacked such a residence in it. Its claim that the plaintiff was required to prove legal settlement in the defendant town was properly overruled by the trial court.

A main contention of the defendant is that the Highland Heights School is a parochial and not a public school, and that even if the plaintiff had authority to maintain it, which the defendant questions, the plaintiff had no recourse to the defendant for the expense of educating the children in such a school. The defendant claims that it is not a public school because it is conducted and maintained in a religious and sec-

tarian atmosphere for children belonging to one, and only one, religious faith.

There are two essentials that must be present to constitute a school a public school. It must remain under the exclusive control of the state through the state's constituted agencies, and it must be free from sectarian instruction. The rationale of the rule is well stated in *State ex rel. Freeman* v. *Scheve,* 65 Neb. 853, 872, 91 N. W. 846, 93 N. W. 169, where it is said that, "if the system of compulsory education is persevered in, and religious worship or sectarian instruction in the public schools is at the same time permitted, parents will be compelled to expose their children to what they deem spiritual contamination, or else, while bearing their share of the burden for the support of public education, provide the means from their own pockets for the training of their offspring elsewhere." As might be expected where a religious question is involved, the authorities are not in agreement as to what constitutes interference with control and with secular teaching. *Gerhardt* v. *Heid,* 66 N. D. 444, 267 N. W. 127; *Hysong* v. *School District,* 164 Pa. 629, 30 Atl. 482; *State ex rel. Johnson* v. *Boyd,* 217 Ind. 348, 368, 28 N. E. (2d) 256; *O'Connor* v. *Hendrick,* 184 N. Y. 421, 428, 77 N. E. 612; *Knowlton* v. *Baumhover,* 182 Iowa 691, 166 N. W. 202; *Synod of Dakota* v. *State,* 2 S. D. 366, 372, 50 N. W. 632; *Williams* v. *Board of Trustees,* 173 Ky. 708, 191 S. W. 507; *Millard* v. *Board of Education,* 121 Ill. 297, 10 N. E. 669; *Dunn* v. *Chicago Industrial School,* 280 Ill. 613, 117 N.E. 735; *Harfst* v. *Hoegen,* 349 Mo. 808, 163 S. W. (2d) 609; notes, 5 A.L.R. 866-879, 141 A.L.R. 1145-1148. Many of these decisions are based upon state constitutional provisions, but the principle is implicit in all public school systems that they must be under public control and secular in instruction.

In the maintenance and management of public schools the board of education of a town is the agent, not of the town, but of the state, and to that end is granted broad powers by the legislature. *Groton & Stonington Traction Co.* v. *Groton,* 115 Conn. 151, 155, 160 Atl. 902; *Board of Education of Stamford* v. *Board of Finance,* 127 Conn. 345, 349, 16 Atl. (2d) 601. That the plaintiff's board of education had authority to establish a school in the building of the orphanage cannot be questioned, or that it had control of the school. *Millard* v. *Board of Education,* supra. It is not disputed that the courses of study in this school conformed to those required by the board of education of New Haven for all of its grammar schools, that its teachers are certified teachers appointed by the New Haven board of education, and that the school is conducted in conformity to the state law.

The defendant, however, claims that it is not a public school because it is conducted and maintained in a religious and sectarian atmosphere for children of one sect. The fact that all of the children who attend the school are of the Catholic faith is not determinative of the question. General Statutes, § 1867, requires that when a child is committed to a custodial agency the court shall, as far as practicable, select one of the same faith as that of the child's parents. It was the apparent purpose of the New Haven board of education to bring the school to the scholars rather than the scholars to the school, as it did at the New Haven Orphan Asylum, for reasons of convenience and economy. It might do this if it maintained control over the school and kept it open to all children and free from sectarian instruction. It has been found by the trial court, and this finding is not attacked, that the school is not maintained exclusively for the inmates of

the orphanage, but always has been open to any child living in the neighborhood regardless of religious faith.

There remain two circumstances concerning the operation of the school that might affect its nonsectarianism; several of its teaching staff are Roman Catholic nuns who wear their religious habits in the classrooms, and religious exercises are held in the schoolrooms before the sessions open. As to the holding of religious exercises in the schoolrooms it does not appear that these immediately preceded the opening of the school sessions. They were held an hour before the opening of the session and lasted for one-half hour. Nor is it found that attendance at such exercises was compulsory to all pupils. The employment of teachers who dress in the habiliments of their religion as affecting the public character of a school has been the source of much controversy, as appears from the cases cited above. The decisions in these cases, however, are, as is to be expected, based upon a wide diversity of facts. The only definite conclusion that may be drawn from them is that whether sectarian influence connected with a school is such as to affect its public character is ordinarily a question of fact for the trial court. We cannot say upon the conceded facts in the case before us that the trial court's conclusion that this was a school such as is contemplaed in the provisions of the statute in question was so unreasonable as to be error as a matter of law.

A final contention of the defendant is that the plaintiff's claims are barred by General Statutes, § 6005, which limits recovery of debts due on simple or implied contracts to actions brought within six years from the time the debt accrues. The trial court, as appears by its memorandum of decision, overruled this claim on the ground that the statute includes only

common-law actions arising out of contract and has no application to situations not involving a contract, express or implied. The ruling was correct. "It is also fortified by the principle that, as respects public rights, a municipality acting in its delegated governmental capacity is not impliedly within the ordinary limitation statutes." *Bridgeport* v. *Schwarz Bros. Co.*, 131 Conn. 50, 54, 37 Atl. (2d) 693; 1 Wood, Limitation of Actions (4th Ed.), p. 173; *Stanley* v. *Schwalby*, 147 U. S. 508, 512, 517, 13 Sup. Ct. 418.

There is no error.

In this opinion MALTBIE, C. J., JENNINGS and ELLS, Js., concurred.

BROWN, J. (dissenting). With the implication in the majority opinion that the plaintiff is not entitled to recover if the school in question is a sectarian rather than a public school, I agree. With the conclusion that upon the facts of this case the trial court was warranted in holding that this was a public and not a sectarian school, I disagree.

As the opinion suggests, a school to be a public school must (1) be under public control and (2) be free from sectarian instruction. It is primarily with regard to its interpretation of this second requisite that I differ from the majority. A child receives instruction by seeing, as well as by hearing. The impressions made upon him by being exposed day in and day out to the sectarian atmosphere implicit in the daily routine, the physical surroundings and the habit of their order worn by the teachers, set forth in the court's finding, may well prove as potent an influence in determining his religious development as would a regularly prescribed course of instruction in formulated precepts. In this connection, this statement by the court in *O'Connor* v. *Hendrick*, 184 N. Y. 421, 428,

77 N. E. 612, concerning the effect the wearing by
nuns of their religious costume while teaching may
have upon their pupils, can fairly be said to apply
with even greater force in the instant case by reason of
the accompanying factors just recited: "There can be
little doubt that the effect of the costume worn by
these Sisters of St. Joseph at all times in the presence
of their pupils would be to inspire respect if not sym-
pathy for the religious denomination to which they so
manifestly belong. To this extent the influence was
sectarian, even if it did not amount to the teaching
of denominational doctrine."

These further statements by Mr. Justice Williams
in his dissenting opinion in *Hysong* v. *School District*,
164 Pa. 629, 660, 30 Atl. 482, likewise seem peculiarly
apropos of the situation before us: "They come into
the schools not as common school teachers, or as ci-
vilians, but as the representatives of a particular order
in a particular church whose lives have been dedicated
to religious work under the direction of that church.
Now the point of the objection is not that their re-
ligion disqualifies them. It does not. Nor is it thought
that church membership disqualifies them. It does
not. It is not that holding an ecclesiastical office or
position disqualifies, for it does not. It is the intro-
duction into the schools as teachers of persons who are
by their striking and distinctive ecclesiastical robes
necessarily and constantly asserting their membership
in a particular church, and in a religious order within
that church, and the subjection of their lives to the
direction and control of its officers. . . . wearing their
peculiar robes which tell of their church, their order
and their subordination to the guidance of their ec-
clesiastical superiors; using their religious names and
addressed by the designation, 'sister,' they direct the
studies and the deportment of the children under their

care, as ecclesiastical persons."

Although not a fact included in the finding, the undisputed evidence shows that during the four years in question this school was attended by an average of three hundred and seventy pupils, every one of whom was a Catholic and an inmate of the orphanage. Under the circumstances, to construe the court's finding that the school "always has been open to any child living in the neighborhood, regardless of religious faith," as demonstrating the nonsectarian character of the school is to substitute theory for reality. Whether this is a public school essentially depends upon the nature of the educational facilities which it affords the public, that is, non-Catholics as well as Catholics. Under our law, education is compulsory. This being so, the specific question is: Can a non-Catholic resident of the area served by this school, subject as he is to taxation to maintain it, lawfully be compelled to face the dilemma of either sending his children to it or paying for their education elsewhere? To my mind, to pose the question is but to emphasize that the answer must be "No."

As the court well said in *Knowlton* v. *Baumhover*, 182 Iowa 691, 704, 166 N. W. 202: "If there is any one thing which is well settled in the policies and purposes of the American people as a whole, it is the fixed and unalterable determination that there shall be an absolute and unequivocal separation of church and state, and that our public school system, supported by the taxation of the property of all alike—Catholic, Protestant, Jew, Gentile, believer, and infidel—shall not be used, directly or indirectly, for religious instruction." With this statement I am in full accord. Giving effect to the principle which it declares, it is my conclusion that the school here in question should not be held to be a public school.