Rita **JOHNSON** et al., Plaintiffs,

v.

William **J. SANDERS**, Secretary of the State Board of Education of the State of Connecticut, et al., Defendants.

Civ. A. No. 13432.

United States District Court,
D. Connecticut.

Oct. 15, 1970.

John Q. Tilson, Wiggin & Dana, New Haven, Conn., for Conn. Assoc. of Independent Schools.

Jeffrey Mines, Hartford, Conn., Richard Belford, New Haven, Conn., of counsel, for plaintiff Jewish Community Relations Council.

Peter L. Costas, Paul W. Orth, Hartford, Conn., for Americans United for Separation of Church & State; Leo Pfeffer, New York City, John A. Berman, Hartford, Conn., of counsel.

Robert K. Killian, Atty. Gen., F. Michael Ahern, Asst. Atty. Gen., Hartford, Conn., for William J. Sanders, et al.

Joseph P. Cooney, Cooney & Scully, Hartford, Conn., Joseph G. Skelly, William B. Ball, Ball & Skelly, Harrisburg, Pa., for intervenors James Buckley, et al.

Before ANDERSON, Circuit Judge, and BLUMENFELD and CLARIE, District Judges.

## MEMORANDUM OF DECISION

ANDERSON, Circuit Judge:

This is an action seeking a declaration that Connecticut's Public Act 791, C.G.S. § 10–281a to § 10–281v (1969), designated the "Nonpublic School Secular Education Act," violates the First and Fourteenth Amendments to the United States Constitution, and also seeking to enjoin the defendant State officials from allocating or expending funds under this statute. Jurisdiction is based on 28 U.S.C. § 1331(a) and this statutory three-judge court has been convened to consider the injunction request pursuant to 28 U.S.C. §§ 2281 and 2284.

The Act in question authorizes the Secretary of the State Board of Education to contract with the operators of certain privately-owned non-profit elementary and secondary schools for the public purchase of "secular educational services" to be supplied to children who are Connecticut residents. Each school sells the State a service defined as "providing instruction in a secular subject," which includes instruction in any course also presented as part of "the curricula of the public schools" of Connecticut. The amount which operators of contracting schools may receive for providing such services is limited to a sum totalling twenty per cent of the salaries they in turn pay teachers of "secular subjects," plus an additional amount based on the cost of textbooks used for such subjects by each resident student attending these schools.[1]

The Act also provides that contracting non-public schools must use the funds with which the State purchases "secular educational services" from them in specific ways. Not only is the amount which these schools receive determined by the cost of teachers' salaries and textbooks, but public funds may be used only for these two components of the actual expense of providing the "instruction" in "secular subjects." The Secretary may "reimburse" contracting schools only af-

---

1. The amount paid for educational services under the Act may include the actual cost of textbooks used, up to $10 per year for each student enrolled in grades 1 through 8 and $15 for each in grades 9 through 12. Only those texts which also have been in use in some public school in Connecticut within the previous five years or are separately approved as non-religious are included. In addition, the price may be raised to as much as 60 per cent of teachers' salaries if a non-public school enrolls various numbers of "educationally deprived children," as these are defined in C.G.S. § 10–266a. An initial sum of $6 million was appropriated under the Act, which provides for payments to be made in four equal yearly installments.

ter they have used their own funds for designated teachers' salaries and textbooks.[2]

In addition, the Act includes a set of specifications concerning the admissions policies of schools through which the State arranges for the furnishing of "secular educational services" to Connecticut children. It requires that each school file an annual certificate of compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d–5, which concerns an absence of racial discrimination in federally-assisted programs.[3] In the next sentence, the Act specifies a policy of "open enrolment for all qualified students meeting [an individual school's] academic and other reasonable admission requirements without regard to race, religion, creed or national origin." The sentence goes on to reveal, however, that this "open" policy is applicable only to a statutorily-fixed quota of admissions available at contracting schools. A school which is "financially supported by regular contributions" of "parishioners or other supporters," independent of fees for any individual child's attendance at the school, "may give a preference" to the children of members of the parish or of such contributors. The number of registrations "open" to all other "qualified" applicants meeting "academic or other reasonable admission requirements" is limited to that fraction of enrollment which corresponds to the percentage which State funds, paid under the Act, represent of the total yearly operating cost of the school.

The plaintiffs, six Connecticut taxpayers, include parents of children attending public schools and the Superintendent of Schools for the Town of East Lyme. Two of the plaintiffs are parents of Negro children. They all contend that Act 791 creates both an unconstitutional establishment of religion and a set of enrollment rules which violate their rights to equal protection of the laws.[4] The plaintiffs, the defendant officials, and twelve parents of children attending Connecticut non-public schools, who have been granted permission to intervene as defendants, have filed motions and cross-motions for summary judgment under Rule 56, F.R.Civ.P.

## I. Establishment of religion

■ By the date of the hearing on these motions, institutions maintaining some 263 Connecticut non-public schools, attended by approximately 91,357 Connecticut resident pupils in 1969–70, had contracted with the State under the Act; and all are scheduled to receive initial disbursements on September 1, 1970. Of these schools, 217 or more are operated by religious bodies. The denominational or parochial schools, of which at least 210 are Roman Catholic,[5] enroll about 87.5%

---

2. The definitional portions of the Act do not refer to "reimbursement," a term which nevertheless appears in several sections dealing with the computation of the price to be paid for purchased instruction. Compare C.G.S. §§ 10–281c and 10–281d with §§ 10–281e, 10–281f, 10–281h, 10–281i, 10–281k, and 10–281o.

3. The principal section. 42 U.S.C. § 2000d, specifies:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

No portion of this Title mentions discrimination on the grounds of religion or sex, nor does it concern programs which are not federally assisted. No evidence has been introduced regarding whether or not any contracting school certifying "compliance" with this provision actually participates in a federally-assisted program.

4. An additional claim, based on an alleged violation of the plaintiffs' rights to the free exercise of their religions, was abandoned.

5. The religious affiliation of 5 schools was listed on application forms as Hebrew or Jewish, while a sixth was listed as Lutheran and a seventh as Episcopalian. Final statistics concerning the precise number of schools and students involved during the first year had not been tabu-

of the total number of pupils receiving state-funded "secular educational services" from contracting schools. The plaintiffs contend that the provisions for payment of general public tax funds to these 217 schools under the Act constitute an establishment of religion. As Connecticut citizens and taxpayers, all six have standing to raise this question.[6] Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1967); DiCenso v. Robinson, 316 F.Supp. 112 (D.R.I. 1970); cf. Lemon v. Kurtzman, 310 F. Supp. 35 (E.D.Pa.1969), prob. juris. noted, 397 U.S. 1034, 90 S.Ct. 1354, 25 L.Ed.2d 646 (1970).

When a state education statute's validity is called into question by such a challenge, "to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968), quoting from Abington School District v. Schempp, 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). The purposes and effects to be considered under this test vary with the specific type of legislative enactment in question, and courts which apply it must beware "the hazards of placing too much weight on a few words or phrases" extracted selectively from opinions dealing with very different facts. Walz v. Tax Commission of City of New York, 397 U.S. 664, 670, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970). For this reason we see no special significance in the dictum emphasized by the plaintiffs, which states that "No tax in any amount, large or small, can be levied to support any religious ac-

tivities or institutions. * * *" Everson v. Board of Education, 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). A distinct "Everson principle" mechanically barring any public financial aid which is paid directly to religiously-affiliated institutions cannot be spun from this verbal cobweb on the theory that it represents controlling precedent, in the absence of a holding in a case actually resembling the one before us. Tilton v. Finch, 312 F.Supp. 1191, 1197 (D.Conn.) prob. juris. noted, 399 U.S. 904, 90 S. Ct. 2200, 26 L.Ed.2d 558 (1970). Accord, DiCenso v. Robinson, supra; Lemon v. Kurtzman, supra. The Establishment Clause test to be applied to this Act is a complex one of "purpose" and "primary effect."

The legislative purpose for the enactment of Act 791 appears with sufficient clarity on its face. Cf. Tilton v. Finch, supra. Section 2, C.G.S. § 10–281b, sets out a state policy of assuring that all Connecticut children "be furnished a good education," either in public or in appropriate non-public schools. It further enunciates an intention to "render some financial aid" to non-public schools, in tandem with governmental "support" of public schools, as part of the State's "general program to promote education." "To the extent that such schools teach religious subjects," it adds, "the intent of this act is that no financial assistance to them shall support or advance any religion or any instruction in religious tenets, doctrine or worship." But insofar as parochial non-public schools "teach secular subjects in a secular manner," the legislation states, "they are entitled to the same assistance as other nonpublic schools." The Act thus an-

---

lated by the date of the hearing on these motions.

6. The complaint initially named the Connecticut Civil Liberties Union, Connecticut Council of Churches, Connecticut Jewish Community Relations Council, Connecticut State Conference of Branches of the NAACP, and Americans United for Separation of Church and State as additional plaintiffs. The complaints of

these so-called "organizational plaintiffs," which alleged that their "common objective" included the separation of church and state and opposition to discrimination against persons because of race or religion, were dismissed by order of this court dated April 23, 1970, for a lack of standing to sue. See Lemon v. Kurtzman, 310 F.Supp. 35, 41 (E.D.Pa.1969), prob. juris. noted, 397 U.S. 1034, 90 S.Ct. 1354, 25 L.Ed.2d 646 (1970).

nounces the purpose of providing funds for certain secular activities of parochial and other non-public schools as an integral part of a general state program of financially "assisting" or "promoting" elementary and secondary education for all Connecticut children. See Board of Education v. Allen, 392 U.S. at 243, 88 S.Ct. 1923, 20 L.Ed.2d 1060; see also Note, Legislative purpose and Federal Constitutional Adjudication, 83 Harv.L.Rev. 1887, 1891–93, 1898–99 (1970).

The "primary effect" of legislation, however, is not always precisely that which its authors optimistically predict in their statements of purpose. In the present case, the distribution of funds in accordance with the Act would certainly allow the State to "assist" or "promote" the education of children attending contracting schools, thereby contributing to the general welfare. But the primary effect of the type of "promotion" prescribed would be much more extensive, transforming a unitary public school system into a dual one which partially incorporates participating private schools as its administrative appendages.

Before the passage of this Act, the State of Connecticut did not have a program or programs which "promoted" separately-administered alternative varieties of secular education in any meaningful sense, despite the implication of the statutory language cited above. Instead, the State required each town to maintain and operate a unitary system of public schools,[7] open to all, which coexisted with a broad spectrum of parochial and other private schools supplying an equally acceptable level of secular education to students whose parents elected to enroll them there. The fact that parents could fulfill their statutory obligation to educate their children[8] by sending them to parochial schools was not the result of the State's formal "promotion" of secular educational activities in these institutions, but of the dedicated voluntary efforts through which private groups assured that their schools met appropriate secular standards while also including religious instruction. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). The State made bus transportation,[9] health and welfare services,[10] and special education services[11] available to students attending parochial and other non-profit private schools; and it also provided for the filing of reports by these schools verifying that they satisfied public school standards of educational quality and physical safety.[12] But just as it has never been suggested that tax exemption for religiously-sponsored libraries, art galleries or hospitals converts such institutions into "arms of the state," Walz v. Tax Commission of City of New York, 397 U.S. at 675, 90 S.Ct. 1409, 25 L.Ed.2d 697, so it was never supposed that these limited state activities constituted public control, endorsement, or "promotion" of the secular education provided independently by parochial schools. Cf. Board of Education v. Allen, *supra*; Everson v. Board of Education, *supra*. The State gave aid to parochial school students and even extended some funds through a program for driver instruction and highway safety administered by their schools;[13] but the only secular education "promoted" with governmental endorsement was offered by the public schools.

With the passage of Act 791, however, Connecticut has sharply altered its relationship to parochial schools and their students. In accordance with this legislation, the State itself assumes responsibility for providing instruction in certain courses at parochial as well as at

7. C.G.S. § 10–186.

8. C.G.S. § 10–184.

9. C.G.S. § 10–281, see Snyder v. Town of Newtown. 147 Conn. 374, 161 A.2d 770 (1960), appeal dismissed, 365 U.S. 299, 81 S.Ct. 692, 5 L.Ed.2d 688 (1961).

10. C.G.S. § 10–217a.

11. C.G.S. § 10–266a.

12. C.G.S. § 10–188; compare § 10–220.

13. C.G.S. § 10–24c.

public schools. This assumption of responsibility is explicit, since the State first "purchases" the secular "instruction" which the contracting parties deliver to pupils on its behalf. Rather than hiring individual teachers, who would become State employees,[14] the State buys a package, including their services, from the institutions which administer such schools. The Act does not purport to assist parochial schools by giving them financial aid for detached non-religious programs paralleling those supplementing or enriching public education, as had been the case previously; nor does it claim to convert Connecticut's relationship to all schools providing secular education—public and private—to an integrated system based upon and supported by "contractual" State payments.[15] Instead, the Act authorizes the State to commence a "general program to promote education" for all children by continuing to "support" public schools for most and simultaneously "purchasing" identical "services" from private institutions for a selected minority.

Furthermore, the Act changes the relationship between the State and private schools in numerous concrete ways. It does not simply authorize the State to turn over checks to contracting schools which are allowed to carry on their mission exactly as in the past.

Under prior law, a private school at which parents might enroll their children in compliance with the compulsory attendance statute was subject to minimal state regulation. At its establishment, such a school could satisfy the local Board of Education, as required by statute, if it were "approved" by the State Board of Education as supplying instruction "equivalent" to that offered in the public schools.[16] To gain this approval, a school was required to provide certain courses of instruction in citizenship; employ the English language as the medium of instruction; keep a school year of at least 180 days; and assure that buildings conformed to general laws governing safety and sanitation (administered by officials not connected with state education authorities).[17] The approval procedure included written application to the Secretary of the State Board, accompanied by certain documentary information; consultative assistance on program development if requested by the school; and finally, a single visit by a committee, appointed by the State Board, to evaluate the program, examine the facilities and equipment, review the general professional preparation of the faculty and the overall stability of the school's financial underpinnings, and make its report. On the basis of this report the Board considered the matter of approval, which, if granted, was thereafter renewed yearly for the first three years and then for periods of up to three years. No provision authorized a detailed inquiry into the contents of courses offered, so long as a school enabled par-

14. C.G.S. § 10–281g specifes that teachers participating in a non-public school's sale of instruction shall not "be deemed to be employees of the state or any public board of education or be entitled to any of the rights of public school teachers provided for in title 10."

15. The Act does not create a "voucher" system applicable throughout Connecticut's schools. As in the past, public schools in each town or school district sign no contracts but instead receive grants of state funds pursuant to C.G.S. §§ 10–260 to 10–263.

16. See C.G.S. §§ 10–184, 10–188. Although this approval process was in operation for a number of years, no regulations governing it were ever published in the Connecticut Law Journal or promulgated as part of the Regulations for State Agencies. However, a collection of mimeographed materials informally outlining approval requirements and setting out a "statement of policy" concerning compliance with them was made available to each applicant school.

17. See C.G.S. §§ 10–18, 10–17, 10–184, 10–15. A fifth requirement, that non-public schools keep "Registers of Attendance" open to State inspection. C.G.S. § 10–188, was interpreted to mean that a private school needed only to provide a count of its full-time pupils on the dates of October 1 and May 1 of each year.

ents to satisfy the statutory requirement that they cause their children "to be instructed in reading, writing, spelling, English grammar, geography, arithmetic and United States history and in citizenship, including a study of the town, state and federal governments." [18] Although approval of a school rested in part upon a review of the professional preparation of its faculty as a unit, the State Board did not formally attempt to approve or disapprove the hiring of individual teachers nor did it require their certification. Finally, although a statute specified that approved private schools continue to file the same "reports and returns concerning the school" as were required by the State from local public schools, the prior law provided expressly that "no report concerning finances shall be required." [19]

Under Act 791, which authorizes the appointment of a new sub-heirarchy including a state "director of nonpublic school secular education" and his staff,[20] public officials are given sweeping responsibility for making certain that religious teachings in no way overlap with the contents or manner of supplying purchased instruction in secular subjects. They no longer simply "approve" the equivalency of a private institution as a whole at specified intervals, but police the nature of the individual units of instruction which the State is purchasing. This is a double-barreled task, because the Board must be certain both that the service provided is the one contracted for—entirely secular instruction —and also that the money paid for it ultimately is spent only for the two secular uses specified under the act—salaries and textbooks.

First, these State officials must see that all courses of instruction purchased, comply with the statutory definition of "secular subject," which demands a "manner of teaching" that does not "indoctrinate," "promote," or even "prefer" any "denominational tenets or doctrine." [21] In order to police this statutory standard, regulations promulgated under the Act give agents of the State Board broad powers of inquiry, including unrestricted authority to visit schools and inspect all relevant materials.[22] As a "manner of teaching" embraces the nature and scope of an individual teacher's activities, the Act requires that officials supervise and verify new reporting procedures in which contracting schools give assurance that teachers whose salaries are being "reimbursed" have no connection with religious instruction during the regular school day.[23]

Because of the unusual nature of the "purchase and sale of instruction" concept, however, supervision does not end with inspection of the secular nature of the service rendered. Act 791 requires not only that the State purchase purely secular instruction, but that the public funds be spent by the school for the particular secular components of this instruction which are salaries of teachers of secular subjects and textbooks. For this reason, public officials are required to intrude even further into the administration of the contracting schools. Since tax funds may be used to pay teachers' salaries, the law authorizes the State to

18. C.G.S. § 10–184. The steps in the approval procedure were outlined in the "statement of policy" supplied to applicant schools, which was adopted by the State Board on June 5, 1968.

19. C.G.S. §. 10–188.

20. C.G.S. § 10–281d(b).

21. C.G.S. § 10–281c(f).

22. § 10–281n–8. Visits to individual classrooms to inspect a particular "manner of teaching" receive no separate treatment in connection with the Secretary's power to "determine compliance by making such inquiry as he shall deem reasonably necessary."

23. Regulation § 10–281n–1 also requires that officials determine that an applicant school "does not engage specifically in educating students to become ministers of religion or to enter upon some other religious vocation." While the first half of this standard might be relatively easy to apply, there is no elaboration of the meaning of "some other religious vocation," which is a denominational concept that might differ among various groups.

specify which individual teachers shall be entitled to supply contracted secular instruction and receive these funds. Before 1969, all teachers were employed by private schools according to each institution's own standards; but under the new law, the State Board must certify that every teacher paid with public funds after 1972 meets detailed educational requirements identical to those to which all public school teachers are held.[24] Parochial school lay teachers, like their public school counterparts, may not receive standard elementary or secondary certificates until they obtain masters' degrees and complete specified courses in general education at an appropriate "teacher preparation institution." In addition, since contractual amounts due each school are computed through complex formulas, State officials are authorized to inspect all the financial records upon which schools base their calculations of these sums.[25] In this respect, the new law takes the State from the former extreme position of specifically excluding inquiries into the finances of private schools to the opposite pole of authorizing the Secretary to request the keeping of all financial records in such manner as to make them subject to *his* "efficient audit."[26]

Beyond these significant alterations in administrative procedure, the Act includes several specifications—set forth

above—concerning the admissions policies of each contracting school, an area with which the State previously had not concerned itself. Additionally, it creates elaborate hearing machinery which may be invoked by any school desiring to protest a conclusion by State officers that the quality of purchased instruction or a school's use of public funds does not comply with statutory requirements.[27]

When the statutory purpose of "assisting" or "promoting" a general program of secular education for all children is compared with the methods by which it is to be carried out, certain consequences are apparent on the very face of the Act. We find that the law's primary effect—the major change which it would bring about in the structure of elementary and secondary education in Connecticut—is the creation of an entirely new species of state-financed and extensively state-regulated "nonpublic" classes. Recognizing that a parochial school's curriculum may include both secular and religious instruction, the legislature has attempted to detach the former from entirely private control and place it at the service of a publicly-administered program to educate all children. The question posed by the Establishment Clause test is whether Connecticut's effort to set up its own partition between the secular and religious activities of parochial schools and take sub-

---

24. See Regulations for State Agencies § 10–146–1, et seq., detailing requirements for State teachers' certificates.

25. Because of the numerous formulae involved in fixing sums and policing "open" enrollment, and also because of the requirement that State funds be pursued into appropriate individual pockets, this authority would necessarily extend to all records. Cf. DiCenso v. Robinson, 316 F.Supp. 112 (D.R.I.1970).

26. This is a typical example of the difference between the type of state activities required by this statute and the previous non-financial regulation of private education common to Connecticut and other states. The intervenor-defendants argue that New York, whose textbook law was upheld as constitutional in Board of Education v. Allen, 392 U.S.

236. 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), laid down somewhat more extensive controls over educational quality —at least for private *secondary* schools —than Connecticut did before passage of the Act, and that these were implicitly approved by that decision. But even these regulations did not include the type of intrusion which Act 791 authorizes, because they did not require any supervision over substantial, complex financial relationships, nor over the "manner" of teaching.

27. C.G.S. § 10–281k provides for notice, a hearing with counsel, findings, a written decision, and judicial review for any school denied approval of "reimbursement" under a contract or found to have failed to comply with any provision of the Act.

stantial responsibility for the former "neither advances nor inhibits religion."

 Had the State taken complete and literal control of the contracting schools and made their entire secular curricula part of its public system for all purposes, by hiring the teachers, renting the facilities, and admitting the students, various aspects of the Act plainly would run afoul of the Establishment Clause. The State could not itself maintain an educational establishment providing secular classes closely integrated with religious instruction, symbols, and observances—even if the latter were the sole responsibility of private groups—in the same buildings during regular school hours. Compare People of State of Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), with Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) ; see also Abington School District v. Schempp, *supra.* Also, a public institution could not use religious affiliation as a prerequisite for admission to its own academically-selective classes without improperly favoring that religion. See Everson v. Board of Education, 330 U.S. at 16, 67 S.Ct. 504, 91 L.Ed. 711; cf. Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The primary effect of Act 791 is not to give the State total control over parochial schools, or even over their administratively-severed secular portions, to operate as its own. Nevertheless, even if a state does not itself formally maintain a school which teaches religion or applies sectarian admission standards, a law may specify types of public identification and involvement with such a school which cause an "excessive government entanglement" with the religious aspects of the institution, thereby advancing or inhibiting religion. See Walz v. Tax Commission, 397 U.S. at 674, 90 S.Ct. 1409, 25 L.Ed.2d 697.

 In this case, the improper degree of entanglement with religion is present in two distinct forms, both based on necessary effects of otherwise appropriate governmental efforts to distinguish and finance only an educational activity which is totally secular. First, the State's instruction-purchasing program sets up unavoidable confrontations and conflicts between public and parochial institutions over the boundary between secularity and religion in this instruction, thereby promoting "the substantive evils against which the First Amendment guards." DiCenso v. Robinson, 316 F.Supp. at 120 ; see Board of Education v. Allen, 392 U.S. at 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (Harlan, J., concurring) ; Abington School District v. Schempp, 374 U.S. at 307, 83 S.Ct. 1560, 10 L.Ed.2d 844 (Goldberg, J., concurring). Additionally, Act 791 violates the Establishment Clause because it requires such extensive state identification with the secular courses that the resulting state-sponsorship of religiously-affiliated institutions makes them act as quasipublic agencies during most of the school day, without at the same time prohibiting them from continuing their religious activities and classifications. Cf. People of State of Illinois ex rel. McCollum v. Board of Education, *supra;* Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

 Many varieties of public financial assistance to parochial schools, or to those attending them, have been granted for particular uses which are fiscally and administratively distinguishable from the daily classroom instruction which these schools provide. Such aid typically is limited to a program which parallels one available to public school pupils and which may be identified by state officers as non-religious without necessity for sustained and detailed administrative relationships, as in the case of bus transportation or textbook provision. See, *e.g.,* Everson v. Board of Education, *supra;* Board of Education v. Allen, *supra;* but see Note, Sectarian Books, the Supreme Court and the Establishment Clause, 79 Yale L.J. 111 (1969). If funds are made available in this form, the focus of the Establishment Clause test is simply "the function, secular or

religious, which the government aid subsidizes." Tilton v. Finch, *supra*, 312 F. Supp. at 1198; but see DiCenso v. Robinson, *supra*. But when financial programs take more complex shapes, additional questions are raised. Statutory controls, of course, must be adequate to assure that public funds are put to a secular use; and this has been the primary judicial concern in some previous cases. But it is also established that administrative arrangements must not be so intrusive that organs of the state become excessively entangled with all of the daily activities of a religious institution receiving public funding and are made to assume the onus of constantly marking the outer perimeters of imprecisely-defined religious doctrine and practice. Cf. Walz v. Tax Commission of City of New York, *supra;* Presbyterian Church in United States v. Mary Eliz. Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). This opposite limit rarely has been pertinent in cases involving schools, because such programs as bus transportation are not doctrinal; and even textbooks need be approved only in gross and at intervals. But a secular "manner of teaching" in each individual instructor's classroom seldom can be isolated and marked acceptable from a distance with such relative ease. The task of defining administratively [28] the point at which each teacher's activities become non-doctrinal and sufficiently secular to be approved for state financial assistance mirrors, i. e. in reversed image, the difficulty of a court system asked to determine regularly whether conduct deviates from religious doctrine in a way which makes a party ineligible for benefits.

See Presbyterian Church in United States v. Mary Eliz. Blue Hull Memorial Presbyterian Church, *supra*. Thus the existence of extensive secular safeguards does not necessarily end judicial inquiry. A constitutional funding measure requires not just artful legislative language, but also the creation of an administrative mechanism through which government may restrict its spending to a readily identifiable secular educational function without "continuing surveillance leading to an impermissible degree of entanglement." Walz v. Tax Commission of City of New York, 397 U.S. at 675, 90 S.Ct. at 1414, 25 L.Ed.2d 697.

In the present case, the parochial school function which is funded is the entirety of secular "instruction" itself. In order to confine assistance to this rather amorphous use, the Act would introduce state supervision into virtually every nook and cranny of a school's administration. Perhaps this is logically necessary. If a conscientious public official is to be certain that tax dollars are spent only for activities which are proper secular subcategories of the school's instruction, he must engage in a program of inspecting and monitoring which even the copious specifications of the Act and its open-ended supplementary regulations only begin to suggest.[29] Many proponents of religiously-affiliated elementary and secondary schools presumably would be at the forefront of those contending that such an unscrambling of largely harmonious instructional activities would be complicated, at the least.[30] See Freund, Public Aid to Parochial Schools, 82 Harv.L.Rev. 1680, 1688–89 (1969). This logical difficulty illustrates Chief Justice Burger's obser-

28. The administrative machinery includes not only state educational officers and inspectors, but also hearing provisions and judicial review.

29. At the hearing, no party was able to offer any indication whatsoever concerning the actual nature and extent of inspections which took place during the first year.

30. For instance, how and by whom would the spirit of the Act indicate that a student misbehaving in a purchased secular class should be disciplined? The law does not specify whether a figure of religious authority, whose salary is not included in the cost of instruction, should supervise such discipline; or whether its "manner" must be wholly secular; or whether distinctions should be made in regard to students admitted under "open" enrollment.

vation that "a direct money subsidy" from a state to a religious institution "would be a relationship pregnant with involvement," Walz v. Tax Commission of City of New York, 397 U.S. at 675, 90 S.Ct. at 1414, 25 L.Ed.2d 697.

 But more important, the detailed plan which the legislature has enacted to separate, purchase, "promote," and regulate the contents of secular instruction goes well beyond a theoretical "subsidy" and brings the potentiality of mutually-damaging involvement to life. Public officials must investigate curricula, materials, and manner of teaching in detail, case by case; oversee the training of teachers; and audit financial records. By doing so, they might disentangle the last thread of religious doctrine from all secular instruction; but by this very process, they would certainly enmesh the state in continuous conflict with churches over the effectiveness with which governmental investigating and policing machinery would be operated. As another court recently has pointed out in relation to a somewhat differently-structured Rhode Island statute, any measure dependent upon annual appropriations for secular programs conducted within parochial schools and featuring complex ongoing administrative relationships with these institutions sets the stage for confrontations and conflicts such as the perpetuation of religious divisions within legislative bodies. DiCenso v. Robinson, 316 F.Supp. at 120.[31] In addition, the policing required by Connecticut's Act inevitably would set religious groups and public administrative officials at odds over the proper boundaries of religious practices within parochial schools. Church groups quite properly would press to maintain the level of religious influence of these schools upon their students at the maximum consistent with the separation required by the new law and the First Amendment, while State administrators would be compelled to guard the line of secularity with equal fervor in order to carry out their statutory and constitutional mandate. Even with an optimum of goodwill on both sides, however, the boundary between a religious "manner of teaching" and a moral secular one would be a constant battleground. We conclude, therefore, that the primary effect of the Act, which we have outlined above, must be characterized as one which either advances or inhibits the religious activities and influence of contracting parochial schools, depending upon how effectively the State enforces the elaborate line it has drawn between secular and religious instruction.[32] If the State pur-

---

31. It is, of course, unquestioned that "Adherents of particular faiths and individual churches frequently take strong positions on public issues including * * * vigorous advocacy of legal or constitutional positions," and that "churches, as much as secular bodies and private citizens have that right." Walz v. Tax Commission of City of New York, 397 U.S. 664, 670, 90 S.Ct. 1409, 1412, 25 L.Ed. 2d 697 (1970). However, the institutionalization of regular political disputes over religion in legislatures is an aberrant version of the advocacy intended by the First Amendment. "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." Abington School District v. Schempp, 374 U.S. 203, 226, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), quoting from West Virginia

State Board of Education v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943).

32. In a state in which members of a particular religious denomination—or members of a coalition of different ones with a like mind on this issue—exercised effective political power, the danger that it might be used in an attempt to blunt or minimize prescribed state investigation and control would always be present. Under such circumstances, it would be meaningless to state that the effects of governmental entanglements are not relevant because school operators fearing them could voluntarily decline to sign a contract. The question of whether to sign or not might turn upon no more than a prediction of whether or not political influence could and would be exerted to render nugatory attempted State enforcement of limitations. Under prospectively favorable circumstances the

chases instruction but engages in only cursory investigation and policing of its nature, then its secularity cannot be assured and it is likely that religion also will be advanced by a transfer of a part of the State's revenue to support it. If officials do their jobs under the Act. zealously, on the other hand, their broad intrusion into the administration of parochial schools will be certain to work changes restricting religion substantially, both as noted and as discussed more fully below. In either case, a law which sets up this inevitable, institutionalized conflict promotes the very evils which the First Amendment bars and cannot be termed primarily secular in effect.

Wholly apart from this constitutional infirmity, Act 791 contains another First Amendment defect. The law is singularly explicit in its inclusion of any or all secular instruction at contracting schools within a system of publicly-"promoted" education which is administered by government for all children. A statute of this kind provides for so much state involvement with certain activities of a "non-public" institution that the latter can no longer be said to make purely private decisions in these secular areas. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); cf. Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4 Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964); Comment, Public Control of Private Sectarian Institutions Receiving Public Funds, 63 Mich.L.Rev. 142 (1964). If such state activities extend not only to financial support, but to most of the significant decisions involved in offering an entire program of secular instruction, from educational standards to admissions and financial arrangements, a . court

might conclude that under various circumstances, as Judge Coffin has put it, "the school becomes 'public' for more purposes than the Church could wish." DiCenso v. Robinson, 316 F.Supp. at 122; see also Lemon v. Kurtzman, 310 F.Supp. at 52 (Hastie, Ch. J., dissenting). In addition to the equal protection problems which such a statute would raise concerning public access to at least the funded and regulated secular classes, it would infringe all taxpayers' First Amendment rights to be assured that their money is not used to sponsor an institution which simultaneously teaches religion or applies selective religious standards. See Flast v. Cohen, *supra*.

Reason demands some outer limit to the defendants' contention that public funds and controls which are not literally earmarked to pay for or regulate religious instruction or observances can never be said to sponsor or otherwise establish an institution which is built around them. Abstract discussion of secular functions must not obscure the realities of how institutions such as schools operate. At one pole, it is clear that payment of aid directly to a religiously-affiliated educational institution does not automatically establish religion just because the sectarian activities of a school may be enhanced by anything which makes it more convenient for children to attend it. See Walz v. Tax Commission of City of New York, 397 U.S. at 671, 90 S.Ct. 1409, 25 L.Ed. 2d 697. But at the other extreme, a law which converts a school's entire task of providing secular instruction from a purely private to a predominately state responsibility, while permitting religious instruction to continue unaltered, would constitute sponsorship of the school—the physical and administrative

---

non-public school institution might very well be willing to waive (as the defendants, in effect, offered to do here) the discomforts of entanglement, assured that they would be made minimal and innocuous in sympathetic official hands. The Establishment Clause is the guardian of the interests of society as a whole and is particularly invested with the rights

of minorities. It cannot be "waived" by individuals or institutions, any more than the unconstitutionality of state-prescribed school prayers could be "waived" by certain pupils absenting themselves from the classroom while they were conducted. See Abington School District v. Schempp, 374 U.S. 203 at 224-225. 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

facility through which religion is taught —even if all public funds were formally designated to be spent for functions other than teaching religion. The test for this sort of institutional sponsorship, which is a variety of "excessive government entanglement with religion" analogous to "releasing" public school students for private religious instruction in their schools, is "inescapably one of degree." See Walz v. Tax Commission of City of New York, 397 U.S. at 674, 90 S.Ct. 1409, 25 L.Ed.2d 697. If a law authorizes a religious group to participate in a contractual education program which requires the state to assume sponsorship of its entire non-religious scholastic curriculum, then the institution receiving funds and being regulated must be tested by standards of religious neutrality similar to those required of a public school.

In the present case, Act 791's device for purchase and sale of instruction authorizes precisely the sweeping resignation of private responsibility which would necessitate Connecticut's sponsorship of contracting schools. These institutions sell undifferentiated units of secular "instruction" to the State. Since the sum which the State pays may be used only to purchase textbooks and pay a portion of teachers' salaries, presumably the institutions subsidize the remainder of the salaries and sell the instructional package to the State at a bargain price well below its true economic cost.[33] The law does not mention the buildings in which the purchased instruction is to be supplied to students, but apparently the use of classroom facilities is also currently to be included gratis as an adjunct to the "instruction"

which is sold.[34] The Act invites private schools virtually to transfer the use of a classroom, equipped with teacher, books, and whatever else is necessary to constitute a unit of "instruction," to the State during the hours when secular subjects are being taught. This is an offer inviting sponsorship. If a school is willing to make the sale on the bargain terms which the law specifies, then the State agrees to let the school administrators handle the actual arrangements, to admit only those whom the school designates to this class, within certain limits, and to ignore its customary practice of excluding sectarian symbols and influences from a school's physical surroundings.

It is not a court's task to pass upon the wisdom of such a bargain, nor to outline the variety of forms which co-operative public and private educational programs might take. It is reasonable to assume that legislators devising such programs would attempt to create mutually-acceptable accommodations of some sort for both the interests of those who have long supported parochial schools and the needs of the State. We do not understand the plaintiffs to argue, nor do we conclude, that in doing so, the lawmakers must provide that every publicly-financed secular class be conducted under identical administrative arrangements; nor are we asked to conclude that the public school system as it is presently structured is insulated from all innovation by constitutional strictures. What we do conclude is that the First Amendment will not permit this difficult area to be glossed over with a law authorizing a "sale" to the State by a religiously-affiliated school of all its secular in-

33. Although the concept of a "sale" of instruction is none too clear in the Act, it also might be theorized that a portion of the cost of purchased instruction in secular subjects is subsidized by the parents of individual students paying tuition charges.

34. The State of Connecticut purchases "instruction" rather than a proportion of the teachers' teaching time as in Rhode

Island but if these means of contribution are, in principle, constitutional, it would be difficult to distinguish Act 791 from a situation where a school reduced its own contribution to a minimum and received a subsidy from the State in an annual amount more nearly the equivalent of the full economic cost of the "instruction" sold to the State. See DiCenso v. Robinson, 316 F.Supp. at 121.

struction. At this point, the government becomes at least the sponsor of a contracting school and must subject it to something resembling the religious neutrality required of public schools. Cf. New Haven v. Torrington, 132 Conn. 194, 43 A.2d 455 (1945).

We conclude that this statute, with a primary effect of turning over formal and financial sponsorship as well as substantial administrative control of all secular parts of parochial schools to the State, while permitting religious aspects of these institutions to remain unchanged, unconstitutionally advances religion.

■ This result is not altered by the intervenor-defendants' claim that their First Amendment right to the free exercise of their religion would be abridged if Connecticut did not purchase secular instruction in this manner from the parochial schools which their children attend. Act 791, as its provisions make abundantly clear, concerns secular instruction and only impinges upon the practice of religion through its efforts to exclude it entirely from certain courses. The invalidation of such a law is therefore totally consistent with the opportunity these defendants will have and always have had to send their children to schools which include religious instruction.

Connecticut has long made elementary and secondary education available to all through the public schools; and despite the attractiveness to legislators of cooperative programs which would avoid the necessity of appropriating large sums to take care of educating in public schools pupils now in private schools, and which would provide state-supported instruction in the most economical manner for all parties, the Establishment Clause does not permit nor does the Free Exercise Clause demand affirmative State action to supply a special variety of secular education in the form outlined by Act 791. Indeed, the Constitution does not dictate any financial measures which would "sponsor" a parochial school in the Establishment Clause sense. "Certainly it would be anomalous if the First Amendment required the State to exclude religion from the public schools but at the same time to support an entire separate school system in order to facilitate the teaching of religion." DiCenso v. Robinson, 316 F.Supp. at 123; cf. Sherbert v. Verner, 374 U.S. at 406–409, 83 S.Ct. 1790, 10 L.Ed.2d 965.

## II. *Equal protection*

■ The plaintiffs also argue that Act 791 violates the Equal Protection Clause of the Fourteenth Amendment by specifying standards for admission to state-funded courses which authorize discrimination on the bases of religion, race, intellectual ability, and financial resources. Their complaint contends that a law which permits one set of schools—both parochial and non-religiously affiliated—to provide state-funded courses for which they charge tuition, apply selective academic criteria, and grant "preferences" to members of certain groups will have "the ultimate result of promoting two school systems in Connecticut, especially in its larger cities —a public school system predominately black, poor, and inadequate, and a non-public school system predominately white, affluent, and superior." [35]

The defendants and intervenor-defendants challenge the plaintiffs' standing to raise this battery of issues. No plaintiff is the parent of a child who has sought and been denied admission to a contracting non-public school, nor has any one of them alleged "such a personal stake in the outcome of the controversy" as to present a clearly defined area of colliding interest between a plaintiff and a defendant which gives rise to the constitutional claim. This requirement is to keep the federal courts from being "asked to decide 'ill-defined controver-

35. Complaint, ¶ 25.

sies over constitutional issues.' " Flast v. Cohen, *supra*, 392 U.S. at 98–101, 88 S.Ct. at 1952.

Under the circumstances we are constrained to hold that none of the plaintiffs has standing to raise the Equal Protection issue. If one of them had been the parent of a Negro child who, though otherwise qualified, had been denied admission to a secular class, purchased by the State, at a contracting school because the "open" enrollment quota was filled, there would have been a clear-cut collision of interests and we would have been presented with an Equal Protection question, the nature of which is disclosed in the evidentiary material [36] supporting the plaintiffs' motion for summary judgment. For the most part the attack is directed at the admissions provisions contained in § 12 of Public Act 791.[37]

While the Equal Protection claims cannot be ruled upon because none of the parties has standing to present them, this disposition of the question, which avoids the merits, should not be construed to imply that, assuming a qualified plaintiff, this court regards the issue itself as frivolous or without substance.

We declare, for the reasons above stated, that Public Act 791, now Connecticut General Statutes § 10–281a to § 10–281v (1969), designated as the "Nonpublic School Secular Education Act," violates the Establishment Clause of the First Amendment to the Constitution of the United States. Judgment may therefore enter in favor of the plaintiffs on their motions for summary judgment and the cross-motions by the defendants are denied. An injunction will issue accordingly. Settle order.

**36.** The allegations there and in the complaint also suggest that any version of a religious standard for admission to a purchased class, such as a preference for a "parishioner," violates the Equal Protection Clause; and it is significant that preferences may be granted on the basis of group support for entire schools, rather than just for those who currently contribute to the support of the particular secular classes purchased. But it is not necessary to attempt to reconcile this claim with the First Amendment. For the reasons stated above, existing tests applicable to Establishment Clause questions are adequate to measure the constitutionality of the religious aspects of this Act.

**37.** This material also has a bearing on the Establishment Clause claim. Although the "open" enrollment provisions specify that academic qualifications may be applied to students seeking admission under them, the Act is silent concerning any similar qualifications required of those to whom a preference may be granted. It is even difficult to determine whether individual students have been admitted under the "open" enrollment provisions or through a preference, since during the initial year the State apparently did not require a record to be kept of this fact. It is clear that the maximum percentage eligible for "open" enrollment would always be significantly fewer than the percentage of the cost of purchased classes which the State pays. because the statutory formula opens the doors only to a number corresponding to the State's share in the maintenance of *all* the expenses of an *entire* school. The best estimate by the parties was that about 10% of the students at a typical contracting school, at any one time, would have been admitted under the "open enrollment" provision after the preferences had been taken care of.

If the State fulfilled its duty to examine into these policies and required the keeping of records as to the granting of preferences and of those admitted under the "open" enrollment provision, and otherwise policed the admissions practices, to insure compliance with the Act, it would inevitably lead "to an impermissible degree of entanglement." Walz v. Tax Commission of City of New York, 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970).